**CLAY T., by Next Friend, Plaintiff,**

v.

**WALTON COUNTY SCHOOL DISTRICT, Defendant.**

No. 3:94–cv–102 (HL).

United States District Court, M.D. Georgia, Athens Division.

Jan. 28, 1997.

Barry Lane Fitzpatrick, Danielsville, GA, for plaintiff.

Terrell W. Benton, Jr., Malcolm Charles McArthur, Athens, GA, for defendant.

LAWSON, District Judge.

This case is before the Court on Defendant's motion for summary judgment. Plaintiff filed suit in the district court appealing the decision of a state administrative hearing officer for the State of Georgia, pursuant to 20 U.S.C. § 1415. For the reasons set forth in this order, the decision of the hearing officer is affirmed in part and reversed in part and Defendant's motion for summary judgment is **GRANTED,** as against all claims set forth by the Plaintiff.

## I. SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be entered in a favor of the movant where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is [1] no genuine issue as to any material fact and that [2] the moving party is entitled to judgment as a matter of law." In deciding motions for summary judgment in the IDEA setting, courts must evaluate the record of evidence from the prior administrative hearing along with any additional evidence produced by the parties, in order to determine whether there are factual disputes requiring resolution in a trial. 20 U.S.C. § 1415(e)(2). Because at summary judgment "the judge's function is

not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), the Court must believe the evidence of the non-moving party and draw all justifiable inferences in its favor. *Id.,* 477 U.S. at 248, 106 S.Ct. at 2510. Summary judgment is not an appropriate occasion to weigh the credibility of evidence.

Although the Court is not to make credibility determinations concerning the parties' evidence, the party opposing summary judgment must be able to demonstrate that there is a genuine issue of material fact as to each essential element of its claim. Otherwise the movant will be entitled to judgment as a matter of law, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). As explained above, the evidence and all factual inferences therefrom must be viewed by the court in the light most favorable to the party opposing the motion; nevertheless, the party opposing the granting of the motion for summary judgment cannot rest on his pleadings to present an issue of fact. The non-moving party must make a response to the motion by filing affidavits, depositions, or otherwise in order to persuade the court that there are material facts present in the case which must be presented to a jury for resolution. *See Van T. Junkins & Assoc. v. U.S. Industries, Inc.,* 736 F.2d 656, 658 (11th Cir.1984).

As to materiality, "the substantive law will identify which facts are material. Only disputes that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. For a question of fact to be "genuine," there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.,* 477 U.S. at 249–250, 106 S.Ct. at 2511. (Cites omitted). The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Irby v. Bittick,* 44 F.3d 949, 953 (11th Cir.1995) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587, 106 S.Ct. 1348, 1355–1356, 89 L.Ed.2d 538 (1986)). Only those doubts about facts that are reasonable must be resolved in favor of the nonmovant. *Irby,* 44 F.3d at 953.

## II. FACTS

Construing all evidence in the light most favorable to the Plaintiff, the Court finds the following facts to be relevant to the determination of this motion.

Clay T. entered the first grade at Walker Park Elementary School in Walton County, Georgia, in the fall of 1989. During the first two years of school at Walker Park, Clay performed well, making average or above average grades, but in the second grading period of his third grade year, in the fall of 1991, Clay scored a failing grade in reading, primarily as a result of his failure to complete homework and classwork. Throughout the year, Clay was inconsistent in doing his schoolwork and at times refused to turn in assignments that he had completed. Although his overall grades at the end of the school year were generally satisfactory, Clay earned low marks in spelling and social studies, as well as reading, for different grading periods.

Clay's mother (Mrs. T.), concerned with the sudden drop in her son's reading score during the second grading period of his third grade year, immediately met with his teacher to attempt to learn what was causing Clay's behavior and to find solutions for the problem. School officials met with Mrs. T. to discuss various ways to ensure that Clay completed and turned in his assignments, such as providing after-school assistance, moving him to a different seat in class, and requiring him to turn in assignments to the principal. Mrs. T. remained in close contact with the school, visiting the classroom two or three times each week throughout the course of her son's third grade year to discuss Clay's progress and consider new alternatives.

In the spring of 1992, at Mrs. T's request, the school began to conduct some informal testing to evaluate Clay's continuing difficulties. The record shows that there is a dispute over the reason for the decision to perform informal tests. Debbie Howard, the school counselor at Walker Park, has testified that she informed Mrs. T. of the option of putting Clay through a formal evaluation process by the Student Support Team (SST), but suggested that informal testing might be more appropriate. According to Ms. Howard, Mrs. T. agreed that informal testing was a better option at the time. The assistant principal, Ann Boyce, has also testified that Mrs. T. rejected the SST and chose to pursue an informal screening process. Mrs. T., however, has testified to the contrary, and avers that she was never told of the SST, but was only told that the school would conduct "informal" tests. There is a further dispute concerning whether or not Mrs. T. requested that the testing be halted following the murder of a next-door neighbor. Plaintiff asserts that she did not request any interruption in testing, but that the testing was completed and that the results showed a 21 point difference between Clay's composite I.Q. and his reading score. There is no evidence that there was any discussion of placement in a special education program.

During the summer following Clay's third grade year, his parents had him privately evaluated by a neuropsychologist, Dr. Michael Shapiro. Dr. Shapiro tested Clay and found that he did not have either attention deficit disorder (ADD) or a specific learning disability (SLD) that would make him eligible for special education services. Instead, Dr. Shapiro found that Clay's problems at school were related to emotional disturbances and a sibling rivalry conflict. Clay's mother reported these findings to school officials, but did not give the school a written copy of Dr. Shapiro's report. Mrs. T. has testified that she assumed that making an oral report of Dr. Shapiro's findings would help the school district determine how to address Clay's problems by allowing them to eliminate ADD or a learning disability as a possible cause. (Deposition of Suzanne T., p. 104).

Clay's fourth grade year started off badly. On his first nine-weeks progress report, he received failing marks in every subject except physical education and art. Once again the reason for his poor performance was his failure to turn in assignments. His parents attended a meeting with school principal Thomas Richardson, assistant principal Ann Boyce, counselor Debbie Howard, and Clay's fourth grade teacher, at which they discussed strategies for dealing with Clay's behavior. Because Clay's defiant behavior seemed to result from a desire to act out against his parents, the principal recommended a "parents hands-off policy" as a means of reducing the pressure put on Clay at home. The parents and teachers agreed to try the program. Although Clay's marks improved substantially during the second grading period, under the new policy, Clay's parents decided after receiving the second progress report that they would seek to enroll both of their sons in a private school, the George Walton Academy. Clay took the entrance examination for the academy twice in March of 1993, and failed both times, but the academy agreed to admit him on the condition that he receive tutoring services during the summer and repeat the fourth grade. At about the same time, Clay intensified his behavior of refusing to turn in assignments, earning 83 zeroes between February 18 and June 2, 1993, as contrasted with the 22 zeroes he earned between September 28, 1992, and February 17, 1993. Because of all the zeroes he received, Clay's grades dropped again on the third and fourth progress reports, and by the end of the year he had earned failing marks in all of his academic subjects.

The parents had Clay retested during the summer of 1993 by Dr. Shapiro, who determined that Clay did not have ADD, but that he did have a specific learning disability described as a "developmental reading disorder." Clay was first diagnosed with ADD in September, 1993, by psychiatrist Dr. Colleen McLemore, who prescribed the drug Ritalin. Clay entered the Walton Academy in the fall of 1993, and continued to attend private tutoring sessions during the school year. His grades at Walton Academy have been generally satisfactory, although there are still

signs of inconsistency and problems completing school work.

The parents requested a hearing before a state hearing officer to determine whether the school had violated the requirements of the Individuals with Disabilities Education Act (IDEA or "the Act") in addressing Clay's problems. Following a hearing in the summer of 1994, the hearing officer found that the school had committed no procedural violations, but that Clay should have been referred to the SST after the third progress report came out in March, 1993. The hearing officer ordered the school and the parents to meet in order to determine an individual education program (IEP) for Clay. Because they did not intend to return Clay to the public school system, the parents refused to attend the IEP meeting. Following the provisions of the IDEA, the parents now appeal the decision of the hearing officer and seek to recover the costs of tuition at Walton Academy and private tutoring for the past three years and for Clay's future private education until the twelfth grade.

## III. ANALYSIS

■■■ The Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.*, is the most recent name for the 1973 Education of the Handicapped Act, a complex, far-reaching statutory and regulatory scheme enacted during one of Congress' frequent spasms of legislative hubris. The overriding concern of the Act is that all children with disabilities have access to a free and appropriate public education individually suited to their special needs. States are required to comply with the provisions of the Act in order to receive the federal funds which it provides for education programs. Naturally, no state has rejected the promise of federal dollars, so all states, including Georgia, are subject to the requirements of the Act. In participating states, local school systems and educational agencies under the Act must offer each disabled child "personalized instruction with sufficient support services to permit the child to benefit educationally;" however, the benefit need not necessarily achieve the "maximum potential" of the child. *J.S.K. By and Through J.K. v. Hendry County School Board,* 941 F.2d 1563, 1572 (11th Cir.1991), quoting *Hendrick Hudson Cent. School Dist. v. Rowley,* 458 U.S. 176, 204, 102 S.Ct. 3034, 3049, 73 L.Ed.2d 690 (1982). "The state must provide a child only with a 'basic floor of opportunity.'" *Drew P. v. Clarke County School Dist.,* 877 F.2d 927 (11th Cir.1989).

The opinions and desires of parents are given considerable weight in the IDEA scheme, and there are several procedural safeguards provided by the statute which emphasize the opportunity of parents to participate at every stage of the process. *Rowley,* 458 U.S. at 205, 102 S.Ct. at 3050. Local school districts must allow a child's parents the opportunity to present a complaint about the identification, evaluation, or placement of the child, (20 U.S.C. § 1415(b)(1)(E)), and parents have the right to challenge school decisions in a due process hearing before an administrative hearing officer. (20 U.S.C. § 1415(b)(2)). Any party aggrieved by the decision of the hearing officer may appeal the decision to a state court or to a United States district court. The district court then has the responsibility to review the record of the administrative hearing, along with additional evidence at the request of either party, and decide based upon a preponderance of the evidence whether any relief is appropriate. In *Rowley,* however, the Supreme Court warned that "the provision that a reviewing court base its decision on 'the preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley,* 458 U.S. at 206, 102 S.Ct. at 3051. In other words, there is no need to respond to legislative hubris with judicial hubris. Courts are not competent to mandate their views of preferable educational methods, but should limit their review to the ensuring that the proper authorities have complied with the mandates imposed by the legislature in the proper democratic process and have not exceeded the discretion of their offices.

IDEA requires state and local educational authorities to provide services for children with a broad range of disabilities. The Act defines "children with disabilities" to mean children

"(i) with mental retardation, hearing impairments including deafness, speech or language impairments, visual impairments including blindness, serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and

(ii) who, by reason thereof, need special education and related services."

20 U.S.C. § 1401(a). Under the federal regulations which accompany the Act, the term "other health impairments" refers to chronic or acute health problems which limit a child's "strength, vitality or alertness." 34 C.F.R. § 300.7(b)(8) (1996). Under the regulations for the State of Georgia, the term may include "impairments such as attention deficit disorders . . ., where the student experiences limited alertness that adversely affects educational performance to a degree of severity as to require special education to meet the unique needs of the student." Ga.Comp.R. & Regs. r. 160–4–7–.08(7)(a)(2). Under the federal regulations the term "specific learning disorder" (SLD) refers to

"a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in an imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations. . . . . The term does not apply to children who have learning problems that are primarily the result of visual, hearing, or motor disabilities, or mental retardation, of emotional disturbance, or of environmental, cultural, or economic disadvantage."

34 C.F.R. § 300.7(10). The Georgia regulations have elaborated upon the definition of specific learning disorder to explain that the term denotes "serious academic deficiencies that are sharply discrepant with measured potential and ability." Ga.Comp.R. & Regs. r. 160–4–7–.08(8). The discrepancy is typically evidenced by an achievement score that is 20 or more points lower than the cognitive ability score. *Id.*

The Act attempts to further its overriding goal of providing a free and appropriate public education for all children with disabilities by requiring state and local educational authorities to implement procedures for the identification, evaluation, and placement of disabled students. The first responsibility of an educational authority is to locate and identify children who might be disabled in some way. Once such students are identified, the authority must have a particular kind of procedures for the evaluation of such students to determine the nature of their disability, if any, and to decide whether they are eligible for special education services. Students are to be evaluated by a multi-disciplinary team of teachers and counselors, which in Georgia is known as the Student Support Team. For each student found eligible for special education services, the school authority must develop an individual education plan (IEP) specifically tailored to meet the student's individual needs. The procedural safeguards provided by the Act are designed to give parents the ability to participate in the evaluation and placement of their child and to object to placement decisions.

The Plaintiff in this case claims that the Walton County School District failed to fulfill its duty to identify disabled students when it did not refer Clay to a Student Support Team for evaluation, after his difficulties in the third and fourth grade, but has not offered any legal argument as to the circumstances under which the statute would require referral to a multi-disciplinary team for evaluation. Neither has Plaintiff stated when the school's duty to evaluate Clay began. Because the reported cases and administrative decisions offer little guidance on the identification issue, it is necessary to examine the provisions of the statute itself in order to determine the nature of the school district's responsibilities. Section 1412(2)(C) commands participating states to formulate a plan which undertakes to assure that

"all children residing in the State who are disabled, regardless of the severity of their disability, and who are in need of special education and related services are identified, located, and evaluated, and that a practical method is developed to determine which children are currently receiving needed special education and related services and which children are not currently

receiving needed special education and related services."

Identification is generally accomplished through various screening processes, such as periodic testing of all students. There is no evidence to suggest that the school district did not have adequate testing and screening practices. The record shows that Clay took the Criterion Referenced Test in the first grade and the Iowa Test of Basic Skills in the second and third grade, without demonstrating any significant deficiency. Along with screening programs, school districts may offer training which would help teachers to identify signs of possible disabilities. Again, there is no evidence and no argument that the Walton County School District failed to train its teachers properly. However, Plaintiff does argue that Clay's teachers had a responsibility to detect signs of learning disability and refer him for evaluation, and that they failed to do so.

■ Because a federal district court does not have the expertise or experience in the field of education presumably possessed by professional educators, and does not have the opportunity to observe a student's classroom behavior over a period of months as his teachers do, the Court must grant much deference to the evaluations of Clay's teachers and the school officials. As noted, IDEA does not give judges authority to determine educational policy. Therefore, in order to establish that the school violated the identification requirements of IDEA, Plaintiff must show that school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate. There is no evidence in this case to show that the teachers and administrators at Walker Park Elementary failed to notice clear signs of a learning disability or ADD. All testimony in the record indicates that Clay's poor marks resulted not from an inability to comprehend or understand classroom material, but rather from his failure or refusal to turn in his assignments, a behavior problem which seems more the result of an emotional disturbance than evidence of a dis-

ability. The regulatory definition of specific learning disability explicitly excludes learning problems that result from emotional disturbance [1]. Because there is a rational justification for the teachers not to recommend evaluation, there is no evidence that the school violated its duty to identify students with disabilities.

There is a fact dispute in the record concerning the "informal testing" which was conducted in March, 1992, but the dispute is not material in light of the later evaluation by Dr. Shapiro in the summer of 1992. Debbie Howard, the school counselor, has testified that she discussed the Student Support Team and the formal evaluation process for special education with Clay's mother, but recommended informal screening as an option. The assistant principal, Ann Boyce, has testified that when Mrs. T. came to her and requested informal testing, she also discussed the SST process. Mrs. T. has testified to the contrary, stating that school officials never told her about the SST, and offered only the option of "informal testing." Assistant principal Boyce began the testing on March 18, 1992. According to the testimony of Ms. Boyce, the testing was interrupted at Mrs. T.'s request because of the murder of a neighbor of the T. family, the shock of which might have affected Clay's test results. Mrs. T. denies that she asked Ms. Boyce to cease testing Clay, but admits that the murder did occur. The reason for the interruption of the testing has some significance because the results of the tests that were done show a twenty-one point discrepancy between Clay's IQ score and his reading score on an achievement test, a sign of a possible learning disability, according to the Georgia regulations. There is no information in the record concerning the school's response to these test results or the response of Clay's parents, nor is there any evidence that Clay's parents at any time insisted or suggested that he be considered for special education.

The significance of the dispute over the March 1992 testing is moot, however, due to

---

1. IDEA does include "serious emotional disturbance" in its catalog of disabilities, but Plaintiff has not claimed that Clay was eligible for special education for such a disability.

the outcome of the private evaluation conducted by Dr. Michael Shapiro in July, 1992. Mrs. T. has testified that she made an appointment for an assessment by Dr. Shapiro before the end of the 1991–1992 school year. There is some evidence in the testimony of Ms. Howard that the school was aware of the parents' plans for an independent evaluation, and their awareness may have had some effect on the decision not to resume testing. After meeting with Clay twice and with Clay's parents once, Dr. Shapiro concluded that Clay did not have a learning disability and did not show signs of Attention Deficit Disorder, but was experiencing emotional difficulties related to a sibling rivalry and a poor self-concept. In his report, Dr. Shapiro describes Clay as "an emotionally guarded and introverted child who expresses his negative feelings through occasional acting-out behaviors and other conduct problems." Parents' Exhibit 31, p. 7. The report notes that Clay displayed some academic weakness in the area of reading comprehension, but not enough to qualify him for special education.

■ Clay's parents never provided the school with a copy of the report, but did explain Dr. Shapiro's findings orally at the beginning of Clay's fourth grade year. The school was perfectly justified in relying on the independent findings as a confirmation of their previous assessment—that Clay was not a candidate for special education—and in seeking other solutions to Clay's continuing behavior problems. The regulations require educational agencies to consider the results of a parent-initiated evaluation in any decision made with respect to the provision of a free and appropriate public education for the child. 34 C.F.R. § 300.503(c)[2]. Accordingly, the Court rejects the decision of the Hearing Officer finding that Clay was entitled to special education services as of March 1993. Furthermore, the subsequent evaluation conducted by Dr. Shapiro in the summer of 1993 is not relevant to the decision of this case, because at that time Clay had been withdrawn from the public school system and the school district was not given the opportunity to develop an IEP based upon the revised evaluation. Plaintiff has presented no evidence, except for the parents' testimony of their subjective lack of confidence in the school system, to show that the Walton County School System was not willing or able to provide a free and appropriate public education to Clay in response to the 1993 diagnosis.

■ Finally, the Court agrees with the finding of the hearing officer that the school committed no due process violations in its dealings with Clay and his parents. IDEA requires that parents receive notification of their due process rights, including the right to object to decisions to evaluate, the right to obtain an independent educational evaluation, and the right to a hearing, whenever a decision is made proposing or refusing to initiate or change the identification, evaluation, or placement of the child. 20 U.S.C. § 1415(b)(1)(C), (D). There is no evidence that any such decision was ever made, triggering such rights, nor is there any evidence that the parents requested any such decision and were refused. To the contrary, the record clearly shows that the parents, particularly Mrs. T., were intimately involved in every aspect of Clay's education, and that the school district made every attempt to comply with the desires of the parents in seeking to deal with his problems. This full and effective parental participation was in conformity with the spirit and letter of IDEA's procedural protections.

## IV. CONCLUSION

The Court finds that plaintiff has not presented sufficient evidence to create a genuine issue of material fact as to whether defendant Walton County School District violated its statutory duties with regard to the education of Clay T., or as to whether the school district was unable to provide a free and appropriate public education for him. Thus Defendant is not obligated to reimburse the parents for their expenses at George Walton Academy or for any other expenses in con-

**2.** Although § 300.503 gives the parent the right to an independent evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency, there is no evidence in this case that the parents disagreed with any evaluation conducted by the school.

nection with his education. Because Plaintiff's Rehabilitation Act claim under 29 U.S.C. § 794 is substantively tied to the IDEA claim, summary judgment is also granted as to that claim, so that all claims currently before the Court are hereby dismissed.