*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0087p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

BOARD OF EDUCATION OF FAYETTE COUNTY,
KENTUCKY,

          *Plaintiff-Appellee,*

    *v.*

L.M., as legal guardian of T.D., a minor; L.M., on
her own behalf; and T.D., by his legal guardian,
          *Defendants-Appellants.*

No. 06-5534

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 04-00266—Jennifer B. Coffman, District Judge.

Argued: February 2, 2007

Decided and Filed: March 2, 2007

Before: MARTIN, COLE, and GILMAN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Marie Allison, ASSISTANT PUBLIC ADVOCATE, Lexington, Kentucky, for Appellants. Robert L. Chenoweth, CHENOWETH LAW OFFICE, Frankfort, Kentucky, for Appellee. **ON BRIEF:** Marie Allison, ASSISTANT PUBLIC ADVOCATE, Lexington, Kentucky, for Appellants. Robert L. Chenoweth, CHENOWETH LAW OFFICE, Frankfort, Kentucky, for Appellee.

---

## OPINION

---

    RONALD LEE GILMAN, Circuit Judge. This appeal is brought by a child with a disability within the meaning of the Individuals with Disabilities Education Act (IDEA). For the reasons set forth below, we **AFFIRM** the judgment of the district court insofar as it upheld the hearing officer's determination regarding the extent of the School District's violation of the IDEA, but **REVERSE** the court's affirmation of the compensatory-education award and **REMAND** the case with instructions to have the appropriate administrative body craft a remedy that complies with the IDEA.

## I.    BACKGROUND

T.D., a minor child, attended preschool and elementary school through the fourth grade under the jurisdiction of the Board of Education of Fayette County, Kentucky (the School District). He exhibited behavioral and academic problems beginning in kindergarten, but was not identified by the School District as a child with a disability within the meaning of the IDEA until May of 2003, just prior to the conclusion of T.D.'s fourth-grade school year. L.M., the child's legal guardian, requested a due process hearing pursuant to the IDEA, which was held by an impartial hearing officer in January of 2004. The hearing officer found that the child was denied a free appropriate public education (FAPE) for his third- and fourth-grade school years (2001-2002 and 2002-2003) due to the School District's failure to refer T.D. for special education after his second-grade year. To remedy this denial, the hearing officer awarded T.D. a compensatory-education package that included 125 hours of specified one-on-one instruction in reading and language skills.

The Exceptional Children's Appeals Board (Appeals Board) affirmed the hearing officer's finding that the child was denied a FAPE for the two years in question, but reversed the hearing officer's award of 125 hours of compensatory education in favor of a more fluid determination of appropriate compensatory education to be prepared by the child's Admissions and Release Committee (Committee). In Kentucky, this Committee is the equivalent of a student's Individualized Education Program (IEP) team under the IDEA.

T.D. was born in February of 1993 and attended elementary school in Fayette County from 1998 through 2003. He was referred for evaluation as a student with possible disabilities under the IDEA in January of 2003, during his fourth-grade school year. The School District conducted a comprehensive evaluation of T.D. shortly thereafter, and the Committee met on May 5, 2003 to review and act on the results of that evaluation. Among other things, the Committee determined that T.D. had been medically diagnosed with attention deficit hyperactivity disorder (ADHD) and that he also met the IDEA eligibility requirements for a reading disability.

The School District does not dispute T.D.'s eligibility under the IDEA. T.D. and his guardian, however, argued before the hearing officer that the School District should have referred T.D. for a disability evaluation under the IDEA's "child-find procedures" as early as kindergarten. Report cards from the first two grading periods of T.D.'s kindergarten year showed that T.D. struggled with behavioral and social skills, beginning language skills, and math. But by the end of T.D.'s kindergarten year, he was meeting expectations in all academic areas, even though he still exhibited behavioral problems. T.D.'s behavioral problems continued for the next three years, and he began experiencing severe academic problems as well. For example, his standardized test scores at the end of the second grade indicated that T.D. was reading "far below grade level" and was considered "at risk." His second-grade teacher requested assistance from a reading specialist and the school's psychologist, and discussed the possibility of a reading disability with the principal. The teacher did not, however, refer T.D. for a formal evaluation under the IDEA.

After T.D. completed the third grade, he was still reading far below grade level. The third-grade teacher recommended that T.D. repeat that grade. His guardian objected, however, and he was promoted to fourth grade. But T.D. attended summer school between the third and fourth grades under the School District's Extended School Services program.

In September of 2002, T.D.'s guardian notified the school that T.D. had been medically diagnosed with ADHD. The school principal then referred T.D. for an IDEA evaluation in November of that year. In February of 2003, the Committee determined that the referral was appropriate and warranted a full evaluation, which was completed in April of 2003. The Committee reviewed T.D.'s evaluation and met on May 5, 2003 to devise a plan of action. At the meeting, the Committee determined that T.D. met the eligibility requirements for special education due to several

disabilities, including his ADHD. The Committee held several meetings during May of 2003 to develop T.D.'s IEP. T.D.'s guardian, unhappy with the IEP as well as the timing of T.D.'s referral for special education, requested a due process hearing pursuant to the IDEA. The hearing officer conducted hearings throughout the fall of 2003 and rendered a written decision on January 30, 2004.

In her decision, the hearing officer concluded that the School District's failure to refer T.D. for a special-education evaluation in the second grade deprived him of a FAPE in the third and fourth grades: "This failure resulted in a loss of educational opportunity and constituted a denial of a FAPE." The hearing officer further concluded that the School District's failure to provide individualized Extended School Year (ESY) instruction during the summer of 2003 also constituted the denial of a FAPE. To remedy these violations, the hearing officer awarded T.D. 125 hours of compensatory education, consisting of one-on-one instruction in reading and language skills, as well as an "additional number of hours equal to the number of hours that [T.D.] would have been eligible for ESY, had the [Committee] considered and determined the need for ESY services in the Summer of 2003." Moreover, the hearing officer ordered the School District to invite T.D.'s private psychologist to the Committee meeting and to pay for the psychologist's attendance.

The School District appealed to the Appeals Board, which agreed with the hearing officer's factual findings but altered the remedy. Instead of requiring a certain number of hours of compensatory education, the Appeals Board "ordered T.D.'s [Committee] to prepare and carry out a plan for providing T.D. with compensatory education services and to meet as required to review and modify the plan, not less than once every twelve months, until the [Committee] determines that the award is fulfilled."

Unhappy with the Appeals Board's decision, the School District filed an action in federal district court, challenging the following two determinations made by the hearing officer and affirmed by the Appeals Board: (1) that T.D. was entitled to ESY instruction for the summer of 2003, and (2) that the School District pay for T.D.'s private psychologist to attend the Committee meeting. T.D. and his guardian asserted 11 counterclaims, 2 of which are the sole issues now on appeal: (1) that the School District denied a FAPE to T.D. during the 1999-2000 and 2000-2001 school years—T.D.'s first- and second-grade years, respectively—as well as during the summer of 2002, and (2) that the limited nature of the compensatory-education award with respect to the 2001-2002 and 2002-2003 school years and the summer of 2003 denied T.D. meaningful relief. The district court affirmed the Appeals Board's decision in its entirety. T.D. and his guardian timely appealed.

## II.    ANALYSIS

### A.    Standard of review

In a lawsuit brought to challenge an IDEA administrative finding, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). "The Supreme Court has construed this provision to mean that an initial reviewing court should make an independent decision based on the preponderance of the evidence but also should give 'due weight' to the determinations made during the state administrative process." *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)).

A district court thus reviews IDEA cases under a modified de novo standard, meaning that it may set aside administrative findings in an IDEA case "only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both."

*Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 519 (6th Cir. 2003) (citation and quotation marks omitted). More weight "is due to an agency's determinations on matters for which educational expertise is relevant." *Deal*, 392 F.3d at 849.

On appeal, we will reverse the district court's findings of fact only if they are clearly erroneous. *Id*. at 850. The district court's conclusions of law, however, are reviewed de novo. *Id*. Finally, "[m]ixed questions of law and fact, including the question of whether a child was denied a FAPE, are reviewed de novo," although the panel should accord "due deference to the state administrative hearing officer's decision." *Id.*

## B.        Timing of referral for IDEA eligibility

T.D. and his guardian first argue that the district court and the Appeals Board erred by failing to find that T.D. was denied a FAPE during the 1999-2000 and the 2000-2001 school years—his first and second grades. They also assert that T.D. was entitled to ESY instruction during the summer of 2002. The hearing officer found that the School District should have referred T.D. for evaluation in the second grade, and that the failure to do so resulted in the denial of a FAPE for only his third- and fourth-grade years. This finding was affirmed by both the Appeals Board and the district court.

The IDEA imposes a "child-find" requirement on the states: their schools must have policies and procedures in place to identify, locate, and evaluate children with disabilities who need special education and related services. 34 C.F.R. § 300.111(a)(1). Even children who are only suspected of having a disability, although they are progressing from grade to grade, are protected by this requirement. 34 C.F.R. § 300.111(c). T.D. and his guardian argue that the School District's failure to evaluate T.D. as early as kindergarten constituted a procedural violation of the IDEA child-find requirement that resulted in substantive harm to T.D.

A school district may be held liable for procedural violations of the IDEA that cause substantive harm to the student. *Metro. Bd. of Pub. Ed. v. Guest*, 193 F.3d 457, 464 (6th Cir. 1999). What a claimant must show to establish a procedural violation is a matter of first impression in this circuit. We now adopt the standard first articulated in *Clay T. v. Walton County Sch. Dist.*, 952 F. Supp. 817, 823 (M.D. Ga. 1997), which provides that the claimant "must show that school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate." This standard was also adopted by the district court below.

### 1.        *First- and second-grade FAPE claim*

The district court affirmed the Appeals Board's finding that the appropriate time for a referral was at the end of T.D.'s second-grade school year. It reasoned that "[i]t is difficult to assess whether a very young child is disabled or merely developing at a rate different from his peers, and the educational experts involved all seem to indicate that a hasty referral for special education can be damaging to a child." On appeal, T.D. and his guardian offer an exhaustive review of T.D.'s educational and behavioral problems in support of their contention that the School District ignored "clear signs" of his ADHD and reading disability as early as kindergarten. None of this evidence, however, is new information that the hearing officer did not already consider, nor does any of it show why the hearing officer's factual findings are clearly erroneous. An educational expert testified that T.D.'s performance in kindergarten should not have caused teachers to "jump to conclusions." The hearing officer, and later the Appeals Board, also gave due weight to expert testimony concluding that "the nature of ungraded primary school recognizes the progress of very young students is not uniform."

As the hearing officer noted, virtually all of the witnesses who testified at the due process hearing, including T.D.'s own expert, stated that T.D.'s difficulties would not necessarily indicate a disability or a need for special education, and that it would be inappropriate to rush to identify a child that young as disabled. School personnel similarly testified that T.D.'s behavioral and learning problems were not atypical of immature young boys.

The School District did not ignore T.D.'s early problems. It took appropriate action by implementing specialized reading instruction, Reading Recovery Program participation, and behavior-management strategies. Under the IDEA, the School District was required to provide a basic floor of educational opportunity consisting "of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Rowley*, 458 U.S. at 201. There is no additional requirement, however, "that the services so provided be sufficient to *maximize* each child's potential commensurate with the opportunity provided other children." *Id.* at 198 (citation and quotation marks omitted) (emphasis added). The School District provided additional services designed to aid T.D. in catching up to his peers in kindergarten and first grade, even though at that point he was not identified as being disabled within the meaning of the IDEA.

We agree with the district court that these services provided a basic floor of educational opportunity through T.D.'s second-grade school year. The interventions in kindergarten and first grade were moderately successful, at least during those years. By the end of kindergarten, for example, T.D. was meeting expectations in all academic areas. T.D. did not start to fall significantly below grade level until the middle of his second-grade year. No teacher suggested that he repeat a school year until after the third grade. In short, nothing in the record compels the conclusion that the School District either overlooked clear signs of disability before T.D. entered second grade or had no rational justification for failing to evaluate him prior to that time. *See Clay*, 952 F. Supp. at 823.

## 2.    *ESY instruction during the summer of 2002*

T.D. and his guardian also contend that T.D. was entitled to ESY instruction during the summer of 2002, following his third-grade year. In lieu of ESY, T.D. received summer school instruction through the School District's Extended School Services program. Extended School Services are available to students with or without disabilities. There is no evidence in the record regarding the nature of the instruction provided to T.D. that summer.

Under the IDEA, schools are required to provide Extended School Services as necessary in order to provide a child with a FAPE. 34 C.F.R. § 300.106(a). A school must provide these services, however, only if the child's IEP team determines that such services are necessary "for the provision of FAPE to the child." *Id.* But a claimant seeking an ESY must satisfy an even stricter test, because "providing an ESY is the exception and not the rule under the regulatory scheme." *Cordrey v. Euckert*, 917 F.2d 1460, 1473 (6th Cir. 1990). This court has held that the burden is on the claimant proposing an ESY to demonstrate, in a particularized manner relating to the individual child, that an ESY is necessary to avoid regression so severe that the child would not be able to catch up during the following school year. *Id.* "If the child benefits meaningfully within his potential from instruction under a proper IEP over a regular school year, then ESY service may not be required under the Act unless the benefits accrued to the child during the regular school year will be significantly jeopardized if he is not provided an ESY." *Id.* (brackets and quotation marks omitted). A claimant must show, in other words, that "an ESY is necessary to permit the child to benefit from his instruction." *See id.* (brackets and quotation marks omitted). Claimants can rely on expert opinion testimony to make this showing and are not required to present empirical proof of actual prior regression. *Id.* at 1471-72.

T.D. and his guardian have offered no evidence that the Extended School Services T.D. received in the summer of 2002 were in any way inappropriate or insufficient to meet his needs. They instead make a conclusory statement that the record "clearly establishes" that T.D. was in need of specialized ESY instruction during that summer. T.D. and his guardian also argue that because the hearing officer found that there was evidence of regression entitling T.D. to ESY instruction for the summer of 2003 (and that evidence of regression was cumulative from kindergarten on), *ipso facto* he was also entitled to ESY instruction during the summer of 2002. We reject this argument as inappropriate bootstrapping.

In any event, as noted by the district court, because T.D. has already received an award of compensatory education, a further award "based on the School District's failure to identify T.D. as a child with a disability after T.D.'s second-grade year would be premature at this point." T.D. and his guardian have failed to demonstrate that T.D. needed ESY instruction (instead of the Extended School Services that he did receive) during the summer of 2002 in order to benefit from the instruction provided to him during the previous school year. The hearing officer found that T.D.'s regression was cumulative from kindergarten on, but did not find that the regression during the summer of 2002 was severe enough to warrant the award of an ESY. T.D. and his guardian have offered no evidence in support of their claim to the contrary. Because T.D. and his guardian have not met their burden of showing why the exceptional remedy of ESY instruction was necessary, we will not disturb the district court's ruling on this ground.

## C.          Procedure for determining a compensatory-education award

In fashioning a remedy for the School District's denial of a FAPE for T.D.'s third- and fourth-grade school years, as well as for the summer following his fourth-grade year, the Appeals Board ordered T.D.'s Committee to prepare a plan for providing compensatory education to the student. The Appeals Board also ordered the Committee to meet periodically, not less than once every 12 months, to review and modify the plan until the Committee determines that the compensatory-education award had been fulfilled.

On appeal, T.D. and his guardian argue that this remedy is "vague, unenforceable," and "allows the school district to determine the remedy for its wrongdoing." They instead seek hour-for-hour compensation for each hour of the school day for the four years that T.D. was allegedly denied a FAPE (1,050 hours per year), plus hour-for-hour compensation for the alleged denial of specialized ESY instruction during the summers of 2002 and 2003 (325 hours per summer). Because we agree with the district court that T.D. was denied a FAPE for two years plus one summer, an hour-for-hour award would equal 2,425 hours (1,050 hours per year for two years plus 325 hours for the summer of 2003).

An award of compensatory education is an equitable remedy that a court can grant as it finds appropriate. 20 U.S.C. § 1415(i)(2)(C)(iii); *see also Park ex rel. Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1034 (9th Cir. 2006) ("The courts have discretion on how to craft the relief and there is no obligation to provide a day-for-day compensation for time missed.") (citation and quotation marks omitted). We review the award granted by the Appeals Board and affirmed by the district court under an abuse-of-discretion standard. *See Park*, 464 F.3d at 1033.

The Appeals Board awarded compensatory-education services that it deemed sufficient to remedy the denial of a FAPE to T.D. for two years—covering his third and fourth grades—plus an additional award of time to cover the ESY instruction that he was entitled to but denied during the summer of 2003. Instead of ordering a specific number of hours as the hearing officer had done, however, the Appeals Board left it to T.D.'s Committee to determine the particular services necessary to remedy the denial of his FAPE. The Appeals Board reasoned that the total number of hours awarded was less important than "the amount of extra services that [T.D.] will receive in a

specific week, or over school breaks and the form of such services." In affirming the award, the district court described the plan as "innovative and likely to be more tailored to T.D.'s needs than an award of a particular number of hours predetermined without benefit of observing T.D.'s progression."

We agree with the district court and the Appeals Board that a flexible approach, rather than a rote hour-by-hour compensation award, is more likely to address T.D.'s educational problems successfully. *See Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 524 (D.C. Cir. 2005) (rejecting an hour-for-hour compensatory-education award in favor of a more flexible approach because some students may need only "short, intensive compensatory programs" while others may need extended programs that would exceed "hour-for-hour replacement of time spent without FAPE"). An appropriate award of compensatory education is "relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." *Parents of Student W. v. Puyallup Sch. Dist., No. 3*, 31 F.3d 1489, 1497 (9th Cir. 1994).

T.D. may well need more than the 125 hours of compensatory education initially awarded by the hearing officer, but nothing in the record suggests that he needs hour-for-hour compensation in order to catch up to his peers. No one disputes that T.D. is a child of at least average intelligence. He has been shown to have an IQ score of 105. On the other hand, T.D.'s counsel stated at oral argument that this child reads at only a fifth-grade level despite the fact that he is now in the seventh grade. Although we are dismayed that no one has yet acted to remedy this deficiency during the two and a half years of pending litigation, we find no basis to claim that T.D., a child of average intelligence, needs over 2,400 hours of remedial instruction in order to arrive on an equal footing with his classmates. Such an award, in the absence of strong evidence in the record suggesting that so drastic a remedy is necessary, would border on punishment to the School District rather than an equitable remedy for a child in need. *See Reid*, 401 F.3d at 518 ("[C]ompensatory awards should aim to place disabled children in the same position they would have occupied but for the school district's violations of IDEA.").

T.D. and his guardian also object to the Appeals Board's resolution on the basis that remanding the details of the compensatory-education award to T.D.'s Committee improperly allows the School District to determine the remedy for its own wrongdoing. This raises the fundamental issue of whether the details of a compensatory-education award can be remanded to the Committee and still comply with the statutory scheme of the IDEA. We review issues of statutory construction de novo. *United States v. Blood*, 435 F.3d 612, 618 (6th Cir. 2006). Although there is no Sixth Circuit precedent on point, a recent case from the District of Columbia Circuit, *Reid*, *supra*, is instructive.

In *Reid*, the hearing officer awarded the student in question 810 hours of compensatory education to remedy the school district's denial of a FAPE for four and a half years. 401 F.3d at 518. He also vested the student's IEP team with the power to reduce or discontinue compensatory services if and when the IEP team determined that the student either no longer needed or was no longer benefitting from the compensatory education. *Id*. Specifically, "[t]he team's decision that [the student] no longer needs or is not benefitting from this award of compensatory education services will terminate this award." *Id*. at 520. The district court affirmed. *Id*. On appeal, the District of Columbia Circuit reversed the district court's ruling, holding that, under the IDEA, hearing officers may not authorize IEP teams to reduce or discontinue awards of compensatory education. *Id*. at 526.

The *Reid* court began its analysis by noting that "IDEA due process hearings 'may not be conducted by an employee of the State educational agency or the local educational agency involved in the education or care of the child.'" *Id*. (citing 20 U.S.C. § 1415(f)(3)). An IEP team, in contrast, is statutorily *required* to include a representative of the local educational agency. 20 U.S.C. § 1414

(d)(1)(B)(iv). Because the IEP team was delegated the power to reduce or terminate the compensatory-education award initially set by the hearing officer, the court held that "the IEP team would in effect exercise the officer's powers." *Reid*, 401 F.3d at 526. "In sum, while the IEP team certainly must monitor [the student's] progress and coordinate compensatory relief with his current IEP, a delegation that permits the team to reduce or terminate his awarded amount of compensatory education exceeds the statute's bounds." *Id*. at 527. The fact that the IEP team was also comprised of nonemployees, including the student's mother, did not change the court's ultimate conclusion. *Id*. at 526. "Under the statute, the hearing officer may not delegate his authority to a group that includes an individual specifically barred from performing the hearing officer's functions." *Id*.

Certainly one could make the argument that because an IEP is comprised of a number of individuals, only one of which must be a representative from the School District, that the School District does not have control over the actions of the IEP team and therefore is not really performing the hearing officer's functions. But we believe that the *Reid* court takes the better approach, creating a clean and clear separation by barring altogether an IEP team's power to terminate a compensatory-education award. Under the statute, an IEP team consists of the disabled child's parents, at least one of the child's regular education teachers, at least one special education teacher of the child, a representative of the local educational agency (here, the School District), "an individual who can interpret the instructional implications of evaluation results," other individuals who have knowledge or special expertise regarding the child, and finally, "whenever appropriate, the child with a disability." 20 U.S.C. § 1414 (d)(1)(B). When the child is still enrolled in the school district that caused the violation, then, his IEP team may consist of three or more employees of that school district—potentially half of the IEP team. T.D. is not currently enrolled in the School District, so the possibility of the School District exerting an undue influence in his particular case is not great, but we decline to approve a practice that might have such an impermissible effect in the future. We therefore hold that neither a hearing officer nor an Appeals Board may delegate to a child's IEP team the power to reduce or terminate a compensatory-education award.

In the present case, the Appeals Board awarded "[t]wo years of compensatory education for the District's delay in identifying and providing education services to the student," as well as an additional award to compensate for the ESY instruction that T.D. should have received in the summer of 2003. The Appeals Board also authorized T.D.'s Committee to determine when the compensatory education award has been fulfilled. As previously noted, an Admissions and Release Committee in Kentucky is synonymous with an IEP team. *See* 707 Ky. Admin. Regs. 1:320. This case is therefore materially indistinguishable from *Reid*. Because we believe that *Reid* was correctly decided, we reverse the compensatory-education award and remand the case to the district court with instructions to reconsider the remedy awarded in a manner consistent with the foregoing analysis.

### III.    CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court insofar as it upheld the hearing officer's determination regarding the extent of the School District's violation of the IDEA, but **REVERSE** the court's affirmation of the compensatory-education award and **REMAND** the case with instructions to have the appropriate administrative body craft a remedy that complies with the IDEA.