[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-11400

_____

D.C. Docket No. 1:14-cv-00659-ELR

CONNOR DURBROW,
ROBERT DURBROW,
CHRISTY DURBROW,

Plaintiffs - Appellants,

versus

COBB COUNTY SCHOOL DISTRICT,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(April 17, 2018)

Before MARCUS and NEWSOM, Circuit Judges, and MOORE,[*] District Judge.

_____

[*] Honorable William T. Moore, Jr., United States District Judge for the Southern District of Georgia, sitting by designation.

MARCUS, Circuit Judge:

At issue in this appeal are several matters relating to the right of an intellectually disabled child to access appropriate public education. The two essential questions presented boil down to this: whether appellants' claims of disability-based discrimination under § 504 of the Rehabilitation Act ("§ 504"), 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, must be administratively exhausted under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*; and whether the IDEA compels a public school district to provide special education to a student with Attention Deficit Hyperactivity Disorder who displays vast academic potential but struggles to complete his work.

Parents Robert and Christy Durbrow and their son Connor ("the Durbrows") appeal from the dismissal of their claims that the Cobb County School District ("the School District" or the "CCSD") discriminated against Connor based on his disability by failing to furnish him with special education services. The district court dismissed their § 504 and ADA claims for noncompliance with the IDEA's exhaustion requirement. The Durbrows also appeal from the denial of their claim that the School District violated its IDEA obligation to evaluate Connor and provide him with uniquely tailored special education. The district court concluded

2

that Connor was entitled to neither an IDEA evaluation nor special education because he did not qualify as a "child with a disability."

We affirm the judgment of the district court.

## I.

## A.

Despite his Attention Deficit Hyperactivity Disorder ("ADHD") diagnosis in third grade, Connor advanced from elementary school through his junior year of high school. Although some of his teachers expressed concern about his difficulties with organization and time management, Connor nonetheless excelled in advanced academic programs and on standardized tests. After graduating from middle school in fall 2009, Connor was admitted into the selective Magnet Program at Wheeler High School, an accelerated course of study for high-achieving math and science students. Beginning in Connor's freshman year, the School District accommodated Connor's ADHD with a § 504 Plan,[1] affording Connor extended test and quiz time, early morning math classes, and small class sizes. Connor's freshman-year counselor, Ms. Suttles, also offered to help Connor stay organized, but the Durbrows declined for fear that Connor might feel singled out.

---

[1] Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), prohibits federally funded programs from discriminating against individuals with disabilities. Additionally, federally funded programs, including the CCSD, must evaluate students with disabilities to formulate § 504 Plans designed to aid the student's access to the general curriculum. See 34 C.F.R. § 104.33.

3

All went well under Connor's freshman-year § 504 Plan, as he passed all of his classes and aced his End of Course Tests ("EOCTs"). Indeed, Connor exhibited such prowess in his Electronics course that his teacher, Mr. George, hired him to solder electric guitar pedals. Although Connor was failing his freshman-year math class at some point during the semester, other students' grades experienced similar ebbs, and Connor's final grade and EOCT score demonstrated his command of the material.

Connor's sophomore and junior years proceeded similarly under the same § 504 Plan. He again earned all As on EOCTs and passed all his classes, excelling especially in Electronics, about which he proudly remarked, "I was really into not only just learning, but also helping other students to learn because I was able to grasp the material very quickly." He enjoyed answering questions in front of the class, maintained voluminous notebooks, completed complex projects, joined the Robotics Team, and even developed an idea for engineering a carnival game using LED lighting. Connor likewise dominated standardized tests. He shined on the PSAT, scoring in the 87th percentile in Critical Reading, 98th percentile in Math, and 90th percentile in Writing Skills. He ranked "at or above level" in every subject on the ACT. As for the SAT, he scored in the 95th percentile for Reading, 98th percentile for Math, and 94th percentile for Writing.

Connor's junior-year teachers unanimously dismissed the suggestion that he needed special education. Two teachers wrote him letters of recommendation to attend MIT. Mr. George regarded Connor as a "natural-born engineer" who stayed on task without special assistance. Mr. Shields, Connor's AP U.S. History teacher, regarded Connor as an intelligent, competent, and sociable guy who could read, write, and analyze better than most. Because he was capable of keeping up with coursework, his parents and teachers attributed his occasionally lackluster performance to insufficient focus and effort. Thus, for example, Ms. Walls, Connor's AP Calculus teacher, believed Connor could have gotten a higher grade if he had simply attended office hours and prepared flash cards. Mr. Shields similarly perceived that, although Connor passed his class, he had not fulfilled his academic potential. Likewise, Connor's parents implored him to "stop blowing off [his] responsibilities" and expressed "disappoint[ment] in [his] choices" when his grades fell short of what they believed he was capable.

Connor's academic performance plummeted in his senior year, with regrettable consequences. While Connor had failing grades at some point during the semester in freshman year through junior year, he ultimately passed every class. Senior year marked the first time he received an "F." Connor amassed late and incomplete work throughout the year, culminating in five failing grades: Advanced Research and Advanced Internship in the fall; and AP Calculus,

5

Engineering Applications, and Honors World Literature in the spring. As a consequence, the School District removed Connor from the Magnet Program and prevented him from graduating in June 2013.

In October 2012, midway through the fall of Connor's senior year when his grades began to deteriorate, the Durbrows and the School District convened another § 504 Plan meeting. During that meeting, Connor admitted to procrastinating. The CCSD responded by expanding Connor's § 504 Plan to include authorization to audio record classes, access to online class notes, and reduced math homework. As Connor's GPA decline steepened, the School District granted him additional accommodations at yet another § 504 Plan meeting in May 2013. That meeting highlighted the essential difficulty raised by Connor's academic turbulence: his failure to complete homework and capitalize on extra exam time. Yet those issues were especially difficult for the School District to remedy, since school counselors are generally unable to manage a student's after-school schedule.

In concert with the May 2013 meeting, and at the Durbrows' request, the CCSD initiated the process for determining Connor's eligibility for special education. At a September 2013 meeting, the School District found Connor IDEA-eligible based on his failure to timely submit assignments during his senior year. The CCSD's special education supervisor believed that Connor's incomplete work

6

was due to his ADHD. Yet both Connor and his senior-year teachers attributed his failing grades not to his disability, but rather to procrastination. In Dr. Adams's Advanced Internship, although Connor demonstrated academic potential, he accumulated many missing assignments. After submitting them untimely, Connor sent Dr. Adams an apology email in which he took ownership of his "lack of effort" and acknowledged, "[I]t's about time that I grow up and start taking responsibility for my own mistakes." Dr. Adams concluded, based on 26 years of teaching experience, that Connor's disability did not prevent him from learning.

The other teachers who gave Connor failing grades voiced the same opinion. None blamed Connor's competency; all blamed Connor's choices.

## B.

Litigation commenced on May 20, 2013, when the Durbrows filed a Due Process Hearing Request with the Georgia Office of State Administrative Hearings (OSAH) alleging that the Cobb County School District failed to identify, locate, and evaluate Connor, in violation of the IDEA and § 504; deprived Connor of a "free appropriate public education" ("FAPE") under the IDEA; denied the Durbrows their procedural rights in violation of the IDEA and § 504; and discriminated against Connor based on his disability under § 504. While the introduction of their Due Process Hearing Request referenced the Americans with Disabilities Act ("ADA"), the Request raised only IDEA and § 504 claims.

7

The School District moved to consolidate hearings on the Durbrows' IDEA and § 504 claims into a single proceeding; the Durbrows opposed consolidation. The OSAH administrative law judge ("ALJ") then denied the CCSD's motion to consolidate, after which the Durbrows withdrew their request for a § 504 hearing. Not surprisingly, the ALJ then scheduled a hearing on *only* the Durbrows' IDEA claims.

The School District defended, urging that some of the Durbrows' claims were time-barred under the IDEA's statute of limitations. The Durbrows countered that they had requested the CCSD to evaluate Connor for special education, but the CCSD failed to inform them of their IDEA procedural rights, thereby tolling the limitations period. But the ALJ found as a fact that the Durbrows did not request an IDEA evaluation until Connor's senior year, when the School District promptly provided the Durbrows with notice of their procedural rights.

Following a substantive hearing on the Durbrows' IDEA claims, the ALJ entered a Final Decision in favor of the School District. Specifically, the ALJ found that, because Connor did not qualify as a "child with a disability" under the IDEA, the CCSD owed no duty to identify, locate, and evaluate Connor for special education. The ALJ also ruled that, since Connor was not a "child with a disability," he was not entitled to special education services under the IDEA.

The Durbrows then took their case to the United States District Court for the Northern District of Georgia, appealing the ALJ's Final Decision and raising § 504 and ADA claims. On the School District's motion, the district court dismissed the § 504 and ADA claims for failure to exhaust administrative remedies. After determining that discovery was unnecessary, the district court directed the Durbrows to file a Motion for Judgment on the Administrative Record. Ultimately, the district court accepted the ALJ's finding that the Durbrows never requested an IDEA evaluation before Connor's senior year, defeating their tolling argument. The district court also sustained the ALJ's determination that, because Connor was not a "child with a disability," he was not entitled to an IDEA evaluation and special education.

The Durbrows now appeal the dismissal of their § 504 and ADA claims, and the denial of their Motion for Judgment on the Administrative Record.

## II.

The IDEA represents an ambitious national undertaking to promote the education of children with disabilities. Congress enacted the IDEA in light of its observation that most disabled children "were either totally excluded from schools or were sitting idly in regular classrooms awaiting the time when they were old enough to drop out." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 179 (1982) (internal punctuation omitted) (quoting H.R. Rep. No.

9

94-332, at 2 (1975)). The Act offers the States federal funds in exchange for a commitment to provide all "children with disabilities" individually tailored special education, also known as a "free appropriate public education" or "FAPE." 20 U.S.C. §§ 1400(d)(1)(A), 1412(a)(1)(A). The principal vehicle for providing a FAPE is an individualized education program ("IEP") prepared by the child's parents, teachers, and school officials that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017).

### A.

In this case, the Durbrows first claim that the district court erred in dismissing their § 504 and ADA claims for failure to exhaust administrative remedies under the IDEA.

In addition to the IDEA, parents of children with disabilities often invoke two federal antidiscrimination statutes in the course of disputes about whether a school district has satisfied its obligations under the IDEA: § 504 of the Rehabilitation Act, which prohibits federally funded programs from discriminating on the basis of a disability; and Title II of the ADA, which applies the same prohibition to public entities.

The Durbrows say that, because their IDEA claims were processed in an Office of State Administrative Hearings ("OSAH") proceeding, they were not

required to pursue an additional administrative hearing with respect to their § 504 and ADA claims. That is incorrect. Because the crux of their § 504 and ADA claims alleged that the School District had denied Connor a FAPE, the claims were subject to the IDEA's administrative exhaustion requirement. The Durbrows' failure to exhaust barred judicial review of their § 504 and ADA claims.

"We review de novo the district court's grant of a motion to dismiss." *M.T.V. v. DeKalb Cty. Sch. Dist.*, 446 F.3d 1153, 1156 (11th Cir. 2006). The relevant statutory framework requires, among other things, that a claimant seeking relief under the IDEA first administratively exhaust the claim. 20 U.S.C. § 1415(i), (l); *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 750 (2017).  The IDEA provides: "[B]efore the filing of a civil action under [ ] laws seeking relief that is also available under [the IDEA], [administrative remedies] shall be exhausted to the same extent as would be required had the action been brought under [the IDEA]." 20 U.S.C. § 1415(l); *see also Fry*, 137 S. Ct. at 750 ("[A] plaintiff bringing suit under the ADA, the Rehabilitation Act, or similar laws must in certain circumstances -- that is, when 'seeking relief that is also available under' the IDEA -- first exhaust the IDEA's administrative procedures."). Since the only remedy available under the IDEA is injunctive relief for the wrongful denial of a FAPE, any such claim must undergo an administrative hearing before proceeding to state or federal court, whether the claim arises under the IDEA, § 504, the ADA, or any

other federal law. *Fry*, 137 S. Ct. at 752–53. The rationale is clear: plaintiffs cannot circumvent the IDEA's exhaustion requirement by suing for a FAPE deprivation under a different federal statute. *Id*. Conversely, if a § 504 or ADA claim does not seek relief for the denial of a FAPE, then the claim is not subject to the exhaustion requirement even if in some way it implicates an intellectually disabled child's schooling. *Id*. Therefore, if and only if a claim alleges the denial of a FAPE, then the IDEA requires exhaustion of administrative remedies for that claim.

In order to determine whether a claim alleges the denial of a FAPE, we look to the gravamen or essence of the claim. *Id*. at 752. We inquire into whether the complaint seeks to harness the "means and ends" that the IDEA provides. *Id*. at 752, 755. While the IDEA guarantees students with disabilities an appropriate educational program tailored to their specific needs, § 504 and the ADA prohibit discrimination in schools as well as in other federally funded programs and public entities. The same misconduct committed by a school district may warrant relief under the IDEA, § 504, or the ADA. But if the complaint essentially alleges the denial of a FAPE, then the plaintiff must exhaust his administrative remedies. *Id*. at 755. The Supreme Court has instructed us that "one clue to whether the gravamen of a complaint against a school concerns the denial of a FAPE, or instead addresses disability-based discrimination, can come from asking a pair of hypothetical questions. First, could the plaintiff have brought essentially the same claim if the

12

alleged conduct had occurred at a public facility that was *not* a school -- say, a public theater or library? And second, could an *adult* at the school -- say, an employee or visitor -- have pressed essentially the same grievance?" *Id*. at 756. Affirmative answers to those questions suggest that the heart of the claim does not concern the deprivation of a FAPE, since the claim would not be inextricably bound to the appropriateness of an intellectually disabled child's educational program. *Id*.

Plainly, the gravamen of the Durbrows' § 504 and ADA claims was that the School District deprived Connor of a FAPE. The Durbrows did not claim that the Cobb County School District committed misconduct independent of its IDEA obligations. Rather, their § 504 and ADA claims focused precisely on the adequacy of the educational program the School District afforded Connor. Thus, for example, the Durbows alleged in their complaint that Connor suffered from ADHD, Amended Complaint at 2–3 ¶¶ 9–11, and "executive functioning disorder,"[2] *id*. at 32–33 ¶¶ 137, 144, and that, based on his disabilities, the "CCSD discriminated against Connor by only providing a magnet program that is designed for high achieving students who do not have disabilities," *id*. at 45 ¶ 212; the "CCSD discriminated against Connor because it refused to provide students with

---

[2] The Durbrows described "executive functioning disorder" as difficulty "setting goals" and "complet[ing] multi-step tasks." "Executive functioning disorder" is not recognized by the Diagnostic and Statistical Manual of Mental Disorders (5th ed.), and is best understood as a symptom of ADHD.

13

disabilities in the magnet program special education direct services," *id*. at 45 ¶ 214; and the "CCSD discriminated against Connor by refusing to provide him services to assist with his executive functioning disabilities and ADHD," *id*. at 47 ¶ 224.

These averments tell us that the essence of the Durbrows' § 504 and ADA charges was that the School District denied Connor a FAPE; they complained that Connor's course of study was not appropriately tailored to his disability. *Fry*, 137 S. Ct. at 756. Put another way, the Durbrows could not have leveled the same allegations against a public library or a theater, since neither are in the business of fashioning educational programs for intellectually disabled students. *See id*. Nor could the Durbrows have advanced the same claims on behalf of an adult employee or a visitor at the School District inasmuch as the IDEA does not entitle adult employees and visitors to individualized special education**.** *See id*.

The exhaustion of an IDEA claim before an administrative body does not relieve a plaintiff of the concomitant obligation to exhaust related § 504, ADA, or any other claims that allege the deprivation of a FAPE. *M.T.V.*, 446 F.3d at 1159; *see also Reyes v. Manor Indep. Sch. Dist.*, 850 F.3d 251, 256 (5th Cir. 2017). In order to properly exhaust a claim that seeks relief for the denial of a free appropriate public education, the claim must proceed through an administrative hearing and receive a final decision from an administrative judge before review

14

may be sought from a federal district court. 20 U.S.C. § 1415(i)(2)(A), (g)(2); *M.T.V.*, 446 F.3d at 1159; *see also Reyes*, 850 F.3d at 256.

The Durbrows failed to exhaust their § 504 and ADA claims. While the introduction of their Due Process Hearing Request referenced the ADA, the Durbrows never pled an ADA claim, and so it is doubtful whether their ADA claims were even properly presented to the ALJ. *M.T.V.*, 446 F.3d at 1159. Regardless, the Durbrows unambiguously opposed the School District's motion to consolidate their IDEA, § 504, and ADA claims into a single proceeding. Then, notably, the Durbrows withdrew their request for a § 504 hearing. The ALJ thus considered only the Durbrows' IDEA claims, not their § 504 or ADA claims. Since the Durbrows' § 504 and ADA claims neither received an administrative hearing nor a decision from the administrative officer, they were not exhausted.

Moreover, the Durbrows' failure to exhaust cannot be excused under the "futility or inadequacy" exception. "The exhaustion of administrative remedies is not required [under the IDEA] where resort to administrative remedies would be 1) futile or 2) inadequate." *N.B. ex rel. D.G. v. Alachua Cty. Sch. Bd.*, 84 F.3d 1376, 1379 (11th Cir. 1996). But a parent's unilateral act cannot create the purported futility or inadequacy. *Id*.

The Durbrows say that exhaustion would have been futile because the ALJ refused to rule on their § 504 and ADA claims. Actually the ALJ declined to

15

adjudicate them in response to the Durbrows' opposition to consolidation and subsequent withdrawal of their § 504 hearing request. The Durbrows thus created the futility about which they now complain. *Id*. If the Durbrows sought to litigate their § 504 and ADA claims, they should have either accepted consolidation *or* sought an additional administrative hearing. Since they did neither, dismissal was proper.

### B.

As for their IDEA claim, the Durbrows argue the district court erred in confining its consideration to claims that accrued within two years before they filed their Due Process Hearing Request. Although the IDEA contains a two-year statute of limitations, the Durbrows assert that the court should have tolled the limitations period since the Cobb County School District wrongfully withheld information to which they were entitled. Specifically, appellants say that, when Connor was in middle school, they asked the School District to evaluate Connor for special education, and that triggered the CCSD's duty to provide them with a written copy of their IDEA procedural rights. The district court rejected the argument, finding that the Durbrows had not requested an IDEA evaluation of Connor until his senior year, at which time the CCSD promptly informed the Durbrows of their procedural rights, rendering tolling inapplicable. The district court did not clearly err in making this finding.

16

Whether parents have requested an IDEA evaluation, thereby triggering the school district's duty to inform them of their procedural rights, is a question of fact which we may review only for clear error. *Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275, 1288 (11th Cir. 2008). The IDEA's statute of limitations requires parents to ask for a due process hearing within two years after they knew or should have known of the basis of their complaint. 20 U.S.C. § 1415(f)(3)(C). The limitations period is tolled if the parent was prevented from requesting a hearing because the school district withheld crucial information, including written notice of the parent's procedural rights under the IDEA. 20 U.S.C. § 1415(c), (d), (f)(3)(D); 34 C.F.R. §§ 300.503(a)(2), (b)(4), 300.511(f)(2); Ga. Comp. R. & Regs. 160-4-7-.12(3)(a)(2).

No documentary evidence supports the Durbrows' tolling argument. The only evidence marshaled by the Durbrows was their own testimony, which was uncorroborated, inconsistent, unspecific, and rejected by the finder of fact. Throughout the OSAH proceedings, the Durbrows could not identify, without substantial prodding, any CCSD personnel from whom they requested an IDEA evaluation. Likewise, in their Due Process Hearing Request, the Durbrows did not name any teacher or counselor from whom they had requested an evaluation. Moreover, when asked whether she had previously requested an IDEA evaluation, Mrs. Durbrow testified that she asked the CCSD for "help" and to "test [Connor]

17

for something." The Durbrows thus support their tolling argument by claiming only that they requested "help" and "test[ing]" from individuals they had difficulty identifying. Meanwhile, the School District's representatives -- including counselors Ms. Suttles and Ms. Higgins and freshman-year math teacher Ms. Buhler -- testified that the Durbrows never requested an IDEA evaluation before Connor's senior year.

The district court did not clearly err in accepting the ALJ's finding that the School District representatives were more credible than were the Durbrows. *See Owens v. Wainwright*, 698 F.2d 1111, 1113 (11th Cir. 1983) ("[C]ourts reviewing a cold record give particular deference to credibility determinations of a fact-finder who had the opportunity to see live testimony."). Moreover, even if the Durbrows had sought "help" or some other form of "testing," such as testing for a § 504 Plan, neither would amount to a parental request for an IDEA evaluation. *See D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 247 n. 5 (3d Cir. 2012) ("[W]e cannot conclude that general expressions of concern constitute a 'parental *request* for evaluation' under the plain terms of the statute.") (citing 20 U.S.C. § 1415(d)(1)(A)(i)) (alteration in original). And it is undisputed that, once the Durbrows requested an IDEA evaluation in May 2013, the Cobb County School District provided them with notice of their procedural rights.

The long and short of it is that the district court did not clearly err in finding that the Durbrows did not ask for an evaluation before Connor's senior year. The district court also correctly applied the statute of limitations, restricting the Durbrows' claims to those arising within two years of filing their Due Process Hearing Complaint.

## C.

The Durbrows substantively claim that the School District violated the IDEA by depriving Connor of a free appropriate public education between the spring semester of his sophomore year (May 2011) and the spring semester of his senior year (May 2013). The question of "[w]hether an educational program provided an adequate education under the [IDEA] is a mixed question of law and fact." *Draper*, 518 F.3d at 1284. We review de novo questions of law, such as the interpretation of a federal statute. *Id.* "Specific findings of fact are reviewed for clear error." *Id.* After reviewing this extensive record, we are satisfied the CCSD did not deprive Connor of a FAPE because Connor did not need special education and, therefore, did not qualify as a "child with a disability."

The IDEA confers the right to a FAPE only upon "children with disabilities." One of the essential purposes of the IDEA is "to ensure that all *children with disabilities* have available to them a free appropriate public education," 20 U.S.C. § 1400(d)(1)(A) (emphasis added), meaning "special

19

education and related services," *id*. at § 1401(9). Conversely, if a student is not a "child with a disability," then the student is not entitled to a FAPE under the IDEA. The Act defines a "child with a disability" as including a child "with intellectual disabilities . . . other health impairments, or specific learning disabilities; and who, by reason thereof, needs special education and related services." 20 U.S.C. § 1401(3)(A). "[O]ther health impairments," in turn, include ADHD that "[a]dversely affects a child's educational performance." 34 C.F.R. § 300.8(c)(9). Therefore, to establish an entitlement to a FAPE, a student with Attention Deficit Hyperactivity Disorder must show (1) that her ADHD adversely affects her academic performance; and (2) "by reason thereof," she needs special education. 20 U.S.C. § 1401(3)(A); 34 C.F.R. § 300.8(c)(9); *see also Alvin Indep. Sch. Dist. v. Patricia F.*, 503 F.3d 378, 383–84 (5th Cir. 2007).

In making this determination, a school district must "[d]raw upon information from a variety of sources, including aptitude and achievement tests, parent input, and teacher recommendations . . . ." 34 C.F.R. § 300.306(c). The purpose of a FAPE, in part, is to "ensure access . . . to the general curriculum so that the child can meet [ ] educational standards." 34 C.F.R. § 300.39(b)(3)(ii). A student is therefore unlikely to need special education if, *inter alia*: (1) the student meets academic standards; (2) teachers do not recommend special education for the student; (3) the student does not exhibit unusual or alarming conduct warranting

20

special education; and (4) the student demonstrates the capacity to comprehend course material. *See Alvin Indep.*, 503 F.3d at 383; *D.K.*, 696 F.3d at 251; *Bd. of Educ. of Fayette Cty. v. L.M.*, 478 F.3d 307, 313–14 (6th Cir. 2007).

It is undisputed that Connor has ADHD, which can be a qualifying disability under the "other health impairments" category if it adversely affected his schooling. 20 U.S.C. § 1401(3)(A)(i); 34 C.F.R. § 300.8(c)(9)(i). But even if we assume that Connor's ADHD constituted a qualifying disability, his problem in this litigation is that he was not a "child with a disability" because he did not, on account of ADHD, require special education. For starters, Connor met or exceeded academic expectations. He was admitted into Wheeler High School's selective Magnet Program based on his achievements in math and science. His academic performance was "better than most, but [not] as good as some." He demonstrated college readiness by excelling on the PSAT. Indeed, until his senior year, he passed all of his classes in an advanced academic program, including Honors and AP courses, while earning straight As on EOCTs. His formidable command of Electronics enabled him to aid fellow classmates. When he sat for the ACT, he ranked "at or above level" in every subject. After taking the SAT, he outscored more than 90 percent of test takers in Reading, Writing, and Math. And although he failed Advanced Research and Advanced Internship in the fall semester of his senior year, he remained on track to graduate. Sadly, it is also true that Connor's

21

grades in the spring semester of his senior year prevented him from graduating. But, during that semester, the School District initiated the process for determining whether Connor qualified for special education under the IDEA. Before then, Connor's overall academic performance ranged from mediocre to extraordinary, and could not demonstrate a need for special education. 34 C.F.R. § 300.39(b)(3), 300.306(c); *see also Alvin Indep.*, 503 F.3d at 383; *D.K.*, 696 F.3d at 251.

In the second place, and significantly, none of Connor's teachers testified that special education was appropriate for him. His Electronics teacher, Mr. George, wholeheartedly dismissed the notion, testifying that Connor could successfully hold a job, take college courses, live independently, and thrive as "a natural-born engineer." Connor demonstrated such deftness in his Electronics courses that Mr. George hired Connor to solder electric guitar pedals, a task threatening severe injury if not performed with pinpointed concentration. His Advanced Internship instructor, Dr. Adams, testified, based on 26 years of experience teaching students with ADHD, that Connor's disability did not impair his academic progress. Likewise, Connor's AP U.S. History Teacher, Mr. Shields, opined that Connor's ability to learn was not affected by his ADHD. Finally, Connor's Honors World Literature teacher, Ms. Thompson, did not believe Connor needed special education. Rather, she insisted that Connor demonstrated his ability to access the general curriculum and make progress when he chose to put forth

22

effort. Connor's senior-year Honors Economics and Honors U.S. Government teacher, Ms. Santelli, and his counselor Ms. Mougdal offered similar testimony. Since none of his teachers or counselors thought that he needed special education, Connor was less likely to qualify as a "child with a disability." 34 C.F.R. § 300.306(c)(1)(i); *see also Bd. of Educ. of Fayette Cty.*, 478 F.3d at 313.

Moreover, although Connor had difficulty with time management and organization, many of Connor's classmates struggled similarly, particularly in the demanding Magnet Program. Thus, for example, Ms. Walls testified that she "had plenty of students that had trouble completing homework because of the workload they have," since their junior and senior years include "very difficult classes." And, although Connor needed a tutor to assist him with AP Calculus, several of Connor's classmates enlisted the same tutor. Mr. Shields testified that Connor did not stand out as either especially high-achieving or low-achieving and, while Connor occasionally received low test grades, so did most of the other students. Furthermore, Mr. Shields spoke with Connor's father at one of Connor's § 504 Plan meetings about how they both struggled to pay attention in class when they were kids. In short, Connor's work habits between May 2011 and May 2013, although occasionally creating concern for his parents and teachers, did not indicate a need for special education. *See D.K.*, 696 F.3d at 251; *Bd. of Educ. of Fayette Cty.*, 478 F.3d at 314.

23

Finally, Connor demonstrated academic progress, further militating against his need for special education. None of Connor's teachers attributed his poor grades to low ability. Although Connor failed Advanced Research and Advanced Internship in the fall of his senior year, his completed work in those courses evinced an ability to absorb material and maintain focus. Indeed, after his Advanced Internship teacher, Dr. Adams, met with him to discuss his incomplete work, Connor acknowledged his "lack of effort" and his need to "grow up and start taking responsibility for [his] own mistakes." Similarly, in AP Calculus, Connor performed well when he chose to, but he failed the course because he neglected to submit a semester-long notebook project and declined to capitalize on the extra exam time provided by his § 504 Plan. Likewise, Connor's senior-year counselor, Ms. Mougdal, remarked that his central issue was his failure to complete homework and utilize extra exam time. Thus, we agree with the district court that Connor did not suffer from an inability to concentrate and progress academically, but rather neglected his studies. We add that special education is generally ill-suited for students who are making academic progress while neglecting to complete their work. Indeed, the School District special education supervisor, Ms. Davies, was reluctant to design an IEP to aid homework completion, observing that such efforts were best left to parents. The CCSD's skepticism toward creating a homework-focused IEP was reasonable, since IEPs are typically fashioned to

ensure students adequately grasp their course material. *See* 34 C.F.R. § 300.39(b)(3), 300.306(c); *see also Alvin Indep.*, 503 F.3d at 383; *D.K.*, 696 F.3d at 251. Connor's neglect of his coursework did not establish a need for special education.

In short, Connor: (1) met academic standards; (2) was not recommended for special education by any of his teachers; (3) did not exhibit especially alarming conduct warranting special education; and (4) demonstrated he was learning, while displaying some weaknesses not readily amenable to special-education remediation. Thus, based on information drawn from a variety of sources, "including aptitude and achievement tests, parent input, and teacher recommendations," Connor "access[ed] . . . the general curriculum" and did not need special education. 34 C.F.R. §§ 300.306(c), 300.39(b)(3)(ii). He was not a "child with a disability," and the Durbrows' claim that he was deprived of a FAPE cannot be sustained. *See* 20 U.S.C. §§ 1400(d)(1)(A), 1401(3)(A); *Endrew F.*, 137 S. Ct. at 993.

### D.

Finally, the Durbrows say that the Cobb County School District breached its "child-find duty" to "identify, locate, and evaluate" Connor under the IDEA. The district court determined that the CCSD did not violate its child-find duty for four independent reasons. We agree. To begin with, because Connor was not a "child

with a disability," the CCSD did not owe the Durbrows a child-find duty. Like the FAPE obligation, the IDEA requires States accepting IDEA funds to identify, locate, and evaluate only "children with disabilities." 20 U.S.C. § 1412(a)(3)(A); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 245 (2009) (describing the child-find duty as States' obligation "to identify, locate, and evaluate all *children with disabilities* residing in the State") (internal quotation marks and punctuation omitted) (emphasis added). As we've discussed, *supra* Part II.C, because Connor was not a "child with a disability," the CCSD did not owe him a child-find duty.

For similar reasons, even if Connor were a "child with a disability" from May 2011 through May 2013, the CCSD still would not have breached its child-find duty because it could not have known that Connor needed special education. Since Connor generally performed well in his classes and did not exhibit alarming behavior, it cannot be said that the CCSD "overlooked clear signs of disability" or "negligent[ly] [ ] failed to order testing." *See Bd. of Educ. of Fayette Cty.*, 478 F.3d at 313 (quoting *Clay T. v. Walton Cty. Sch. Dist.*, 952 F. Supp. 817, 823 (M.D. Ga. 1997)); *see also D.K.*, 696 F.3d at 251; *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 738 (3d Cir. 2009) (under the child-find duty, school districts must evaluate "all students . . . reasonably suspected of having a disability").

26

Moreover, the School District attended to Connor's academic shortcomings through means other than special education. When a school district uses measures besides special education to assist struggling students, it is even less likely in breach of its child-find duty. *See D.K.*, 696 F.3d at 252 ("Finally, the measures the School District did take to assist D.K. in the classroom militate against finding a Child Find violation."). Connor's struggles related to organization and time management. In response, Connor's counselor, Ms. Suttles, offered to help Connor organize his notebooks and assignments, but the Durbrows declined the offer in order to avoid singling their son out. In addition, the CCSD prepared a § 504 Plan for Connor offering extra time on tests, quizzes, and standardized tests; scheduled math as early in the day as possible; and placed him in the smallest classes possible. In the beginning of Connor's senior year, as his incomplete assignments began to mount, the CCSD amended his § 504 Plan to reduce his homework load and permit him to audio record classes and access class notes online. As Connor's missing work proliferated, the CCSD again modified Connor's § 504 Plan. The School District demonstrated individualized attentiveness and sensitivity to Connor's difficulties, also counseling against a child-find violation.

Lastly, even if Connor qualified as a "child with a disability" following his senior-year academic decline, the CCSD satisfied its child-find duty by initiating the IDEA-eligibility process at the Durbrows' request. School districts are granted

27

a "reasonable time" to identify, locate, and evaluate children with disabilities once they are on notice of the student's need for special education. *See D.K.*, 696 F.3d at 250. The Durbrows and the CCSD initiated the IDEA-eligibility process in May 2013, during the spring of his senior year after Connor received two failing grades. Thus, even if Connor's senior-year grades rendered him a "child with a disability" -- and the record does not support that conclusion -- the CCSD fulfilled its child-find duty by evaluating him within a reasonable time. *Id*. It is unfortunate that Connor did not graduate from high school at the end of his senior year when he was more than capable of doing so. Still, the School District made numerous attempts to provide Connor with uniquely tailored aid and cannot be held responsible for Connor's senior-year academic downturn.

The district court properly dismissed the Durbrows' § 504 and ADA claims for failure to exhaust administrative remedies and denied their Motion for Judgment on the Administrative Record.

**AFFIRMED.**

28