RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0036p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JA. B., Student; M. B. and JO. B., in their own
capacities and as parents of Ja. B.,
                              *Plaintiffs-Appellants*,

              *v.*

WILSON COUNTY BOARD OF EDUCATION dba Wilson
County Schools,
                              *Defendant-Appellee*.

⎫
⎪
⎪
⎪
⎬  No. 22-5417
⎪
⎪
⎪
⎭

─────────────────

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:20-cv-00955—William Lynn Campbell, Jr., District Judge.

Argued: January 11, 2023

Decided and Filed: March 6, 2023

Before: SILER, COLE, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Janet H. Goode, JANET GOODE LAW, Memphis, Tennessee, for Appellants.
Kenneth S. Williams, WIMBERLY LAWSON WRIGHT DAVES & JONES, PLLC,
Cookeville, Tennessee, for Appellee. **ON BRIEF:** Janet H. Goode, JANET GOODE LAW,
Memphis, Tennessee, Michael F. Braun, BRAUN LAW, Nashville, Tennessee, for Appellants.
Kenneth S. Williams, WIMBERLY LAWSON WRIGHT DAVES & JONES, PLLC,
Cookeville, Tennessee, Lauren Walker Bush, Lebanon, Tennessee, for Appellee.

─────────────────

## OPINION

─────────────────

COLE, Circuit Judge. Ja. B. and his parents, Jo. B. and M. B., brought an administrative
due process complaint against Wilson County Board of Education, d/b/a Wilson County Schools

("WCS"), alleging that the school district violated its responsibilities under the Individuals with Disabilities Education Act ("IDEA") by failing to identify and evaluate Ja. B. for special education services. After a hearing, a state administrative law judge determined that the district did not violate its responsibilities under the IDEA. A magistrate judge issued a report and recommendation to affirm this ruling, which the district court adopted. We affirm.

## I. BACKGROUND

### A. Facts

Prior to 2017, Ja. B. lived in Illinois with his adoptive parents, Ja. B. and M. B. While in Illinois, Ja. B. had no formal mental health diagnoses, but he struggled to regulate his emotions from an early age. As early as age two, Ja. B. exhibited "rage behaviors," and in elementary school, Ja. B. began seeing a therapist to assist with his emotional regulation. Though his parents were aware of some behavioral issues with Ja. B. at school in Illinois, most of Ja. B.'s concerning behaviors occurred at home. Indeed, Ja. B.'s Illinois school records reflected that he was meeting both academic and behavioral expectations. While in Illinois, he had no safety plan, individualized education program ("IEP"), or section 504 plan, but his parents maintained a close, collaborative relationship with his teachers.[1]

In late July 2017, Ja. B. and his family moved to Tennessee. As the family prepared for the move, M. B. requested a tour of Ja. B.'s new school, Mount Juliet Middle School ("MJMS"), explaining Ja. B.'s anxiety and hoping that seeing the school might ease the transition. Though initially told that a tour was not possible, M. B. stopped by anyways and was able to see the school briefly. Then, just before the school year began, M. B. met Jade Bowman, MJMS's eighth-grade counselor, and discussed Ja. B.'s background and needs with her.

---

[1]A safety plan is created to ensure a student's safety at school, often in response to a hospitalization or mental health concern. An IEP is a written plan for students with disabilities under the IDEA created to ensure the student receives a free appropriate public education based on their specific needs. *See* 20 U.S.C. § 1414(d) (outlining IEP requirements). A section 504 plan arises under section 504 of the Rehabilitation Act of 1973 and provides disability accommodations. 29 U.S.C. § 794(a). "A principal difference between section 504 and the IDEA relates to the specific students covered by the statutes." *B.H. v. Portage Pub. Sch. Bd. of Educ.*, No. 1:08-cv-293, 2009 WL 277051, at *6 (W.D. Mich. Feb. 2, 2009). Generally, section 504 protects a larger group of individuals. *Id.* "Section 504 applies to an individual with a disability as defined in 29 U.S.C. § 705(20)(B), but the IDEA limits its protection to children who have one of the specific disabilities listed in the statute and who need special education and related services as a result of that disability." *Id.*

The first two weeks of school passed uneventfully, but on August 16, Ja. B. received his first disciplinary referral of the year and served an in-school suspension after he "argued with other students, was [disrespectful] to his teacher, refused to complete assignments, and would not re-enter the classroom when told to do so." (Hr'g Ex. 36, R. 16-5, PageID 2085.) M. B. and Ja. B. determined it was time to write to Ja. B.'s teachers to explain Ja. B.'s adoption history and behavioral history at home and at school, as well as to suggest strategies that had been helpful in the past.

Throughout August and September, Ja. B. and M. B. communicated back and forth with Ja. B.'s teachers and school administrators. On September 8, M. B. reached out to Ja. B.'s teachers requesting assistance and intervention from the school, noting her concern that Ja. B. was refusing to complete his homework, and describing his grades as "terrible."

On September 11, Alaina Hatfield, one of Ja. B.'s teachers, reached out to M. B. and Ja. B., explaining that Ja. B. "had a rough day with behavior in [her] class," refused to complete his work, and received a 12% on a recent test "because he did not try at all." (Hr'g Ex. 16, R. 16-4, PageID 1962.) In response, M. B. expressed her disappointment and indicated that she had not received a reply to her September 8 email seeking assistance. Late that evening, Bowman replied to the emails, providing information about upcoming parent-teacher conferences and tutoring resources.

On September 19, Ja. B. and M. B. met with several of Ja. B.'s teachers, Bowman, and assistant principal Chareda Sims to discuss their concerns. At the meeting, Ja. B. and M. B. shared more about Ja. B., and school personnel suggested additional supports for him at school. The primary intervention discussed at this meeting was the use of an agenda that teachers would fill out after every class. After the meeting, Bowman emailed Ja. B. and M. B., confirming that she reviewed the agenda expectations with Ja. B. and providing a list of local tutoring resources.

The next day, Ja. B. received another in-school suspension after he was disruptive and rude in class and "[r]ipped a folder up and threw it on the ground." (Hr'g Ex. 36, R. 16-5, PageID 2084.) At home that evening, Ja. B.'s behaviors escalated again. As a result, Ja. B. was admitted to Vanderbilt University Medical Center, where he remained until September 27.

Ja. B.'s parents informed the school of Ja. B.'s hospitalization the following morning and contacted the school again on September 22 requesting assignments and explaining that Ja. B. may "leave with a diagnosis and treatment plan, including steps towards a 504 for him for school[.]" (Hr'g Ex. 21, R. 16-4, PageID 1977.)  Ja. B.'s discharge papers listed the following diagnoses: unspecified disruptive, impulse-control, and conduct disorder, and Generalized Anxiety Disorder.

Following his discharge from Vanderbilt, Ja. B.'s parents met with Bowman again.  The team discussed Ja. B.'s discharge, his new medications, and a series of other topics based on information from Vanderbilt, including the possibility of exploring an IEP or section 504 plan. Bowman informed Ja. B. and M. B. that the section 504 process would come first and the possibility of an IEP would come later, depending on the section 504 plan's efficacy, because school officials believed a tiered intervention system was most appropriate.  Given the school's two-week fall break and the two-week observation period required for the section 504 process, the meeting to discuss the section 504 plan was scheduled for October 30.

After fall break, on October 19, Ja. B. received two additional disciplinary referrals in one day:  one for disobeying a teacher's directions and being disrespectful and a second for cursing at a librarian.  The first resulted in an in-school suspension, and the second in an out-of-school suspension.

Then, around dismissal on October 27, Ja. B. was involved in a series of events that ended with his arrest by a school resource officer.  The altercation began when Ja. B. witnessed a fight between two other students.  As school personnel responded to the fight, Ja. B. cursed at school officials, refused to follow an assistant principal and school resource officer's directions, and continued to yell and curse at the responding adults.  The officer then arrested Ja. B., who was "charged with disorderly conduct and resisting arrest," though these charges were eventually dropped.  (Hr'g Tr., R. 16-3, PageID 1059, 1073.)  Ja. B. was suspended pending a hearing before the Student Disciplinary Hearing Authority ("SDHA") to determine if Ja. B. should be placed in the district's alternative school, MAP Academy.

Ja. B.'s parents met with the school team as previously scheduled on October 30 and learned more about the SDHA hearing and MAP Academy. Concerned that a transfer to MAP Academy would impact their ability to enroll Ja. B. in a private school, Ja. B. and M. B. withdrew Ja. B. from the district before the hearing occurred and proceeded to homeschool Ja. B. for the remainder of the 2017–2018 school year. At the time of his withdrawal, Ja. B.'s report card showed one A, one B, three Cs, and one incomplete.

Ja. B.'s parents met with district employees three more times during the 2017–2018 school year. In November 2017, Ja. B. met with school officials to finalize Ja. B.'s section 504 plan. In February 2018, Ja. B. met with MJMS's principal, Leigh Anne Rainey. At this meeting, Ja. B. requested that WCS remove the suspension following Ja. B.'s arrest from his record given that the charges were dropped, but Rainey said that this was not possible. Ja. B. also testified that he presented Rainey with a neuropsychology evaluation performed by Dr. Jackie Klaver that resulted in new diagnoses for Ja. B., and he recalled Rainey saying that these diagnoses would have qualified Ja. B. for an IEP. In her testimony, Rainey remembered Ja. B. mentioning the report, but she did not recall seeing the report or discussing how it would have affected Ja. B.'s eligibility for special education services. In June 2018, Ja. B. and M. B. met with Tammy Crane, WCS's section 504 coordinator. According to Ja. B., "the primary purpose of that meeting was to make sure that someone at the district level knew about the experience that we had had in the district and the arrest and the treatment of [Ja. B.] and the challenges that we faced." (*Id.* at PageID 1083.)

Later that summer, Ja. B. and M. B. enrolled Ja. B. in Cates Academy,[2] a local private school, for the 2018–2019 school year. While attending Cates, Ja. B. was re-admitted to the hospital in November 2018 and January 2019 due to his behavior at home. Then, between January and March 2019, Ja. B. attended Meridell, a residential treatment center in Texas, primarily "for emotional regulation, medication, [and] stabilization." (*Id.* at PageID 1099.) Ja. B. returned to Cates for the remainder of the 2018–2019 school year and the entire 2019–2020 school year.

---

[2]Cates Academy is now Robson Academy.

**B.  Procedural History**

On May 1, 2019, Ja. B.'s parents filed an administrative due process complaint alleging that WCS denied Ja. B. a free appropriate public education ("FAPE") by failing to identify and evaluate him for special education services and failing to design and implement an IEP for the 2017–2018 and 2018–2019 school years.  The complaint was later amended to include an additional violation for failure to design and implement an IEP for the 2019–2020 school year and several other claims not relevant here.  As a result of the due process complaint and the required resolution session, WCS initiated an evaluation and determined that Ja. B. was eligible for special education and related services.  *See* 34 C.F.R. § 300.510.

An administrative law judge from the Tennessee Department of Education Division of Special Education held a four-day hearing during which the parties presented testimony from many fact and expert witnesses.

Several school employees who knew Ja. B. testified about his behavior.  Ava Cozart, one of Ja. B.'s teachers at MJMS, indicated that while Ja. B.'s behaviors were "beyond what [she] dealt with with any other child," she also did not see the need to request a special education referral based on what she was seeing from Ja. B.  (Hr'g Tr., R. 16-3, PageID 1376, 1383–84.) Jeremy Willis, an assistant principal at MJMS, explained that while some of the behaviors he saw from Ja. B. were worrisome, Ja. B.'s behavior was not out of the ordinary for a middle school student.

Dr. Eboni Webb, who worked with Ja. B. and his family after he withdrew from WCS, testified as an expert in developmental trauma.  She expressed her opinion that Ja. B.'s behavior was likely the result of developmental trauma, and it was "not uncommon for children like [Ja. B.] to need highly structured education settings to regulate his emotions and manage stressors in order to facilitate optimum learning." (*Id.* at PageID 926.)  Though her report noted that Ja. B. was "not thriving academically," Dr. Webb explained that she was not familiar with Ja. B.'s academic record prior to his move to Tennessee, and she had not inquired about Ja. B.'s academics during her evaluation of Ja. B. beyond the parental reports. (*Id.* at PageID 947–48, 969.)  Her opinion regarding his academic performance was based on "the intakes and reports we

had of his behavioral disturbances in the school and the ongoing problems at home." (*Id.* at PageID 969.) Her work with Ja. B. and his family primarily focused on "stabilizing him at home because of the behaviors that were happening [there]." (*Id.* at PageID 965.)

Angela Barnes, WCS's Exceptional Education Supervisor, served as an "expert in the field of educational curriculum and instructional development, specifically for special education in students with disabilities." (*Id.* at 1670–71.) Based on her expertise and review of Ja. B.'s Illinois records, it was her opinion that nothing indicated Ja. B. needed special education services or other interventions at the time of his transfer to MJMS.

Nicole Kanew, a board-certified behavior analyst, provided expert testimony "in the field of behavior . . . analysis, treatment and specifically in the area of curriculum and instruction in a school setting for students with disabilities." (*Id.* at PageID 1754.) In Kanew's opinion, a referral for a Functional Behavioral Assessment—a form of additional intervention sometimes used in conjunction with an IEP—would not have been appropriate based on her review of Ja. B.'s WCS disciplinary records.

Dr. Clovis Stair, a school psychologist supervisor, testified "as an expert in the field of school psychology, educational testing[,] and educational development[,] with an emphasis in special education, specifically determining student eligibility for special education services[.]" (*Id.* at PageID 1822.) Dr. Stair stressed the importance of avoiding rushing to judgment about a child's possible disability. According to Dr. Stair, WCS's plan to implement interventions, observe their efficacy, and adjust course as needed before referring for an IEP evaluation was appropriate, particularly in light of Ja. B.'s general education background and recent move.

In September 2020, the ALJ issued a final order determining that WCS did not deny Ja. B. a FAPE because the district did not violate its obligation to identify and evaluate Ja. B. for special education services either during or after Ja. B.'s enrollment at MJMS. In doing so, the ALJ determined that Plaintiffs were not entitled to reimbursement for Ja. B.'s private school education and accordingly did not address the appropriateness of the private placements.

Plaintiffs filed a complaint in the Middle District of Tennessee under 20 U.S.C. § 1415(i)(2) and moved for judgment on the administrative record. After reviewing the record,

a magistrate judge issued a report and recommendation to affirm the ALJ's final order. The district court overruled Plaintiffs' objections and adopted and approved the magistrate judge's report and recommendation. Plaintiffs appeal.

## II. ANALYSIS

### A. The IDEA

The IDEA was created "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A). To meet this goal, Congress enacted a comprehensive statutory scheme outlining the responsibilities of government agencies and the procedural and substantive guarantees provided to students with disabilities and their families. *See id.* §§ 1400–1482.

Relevant here, the IDEA imposes a "child-find mandate" on all local education agencies ("LEAs").[3] This mandate requires all LEAs, such as WCS, to identify, locate, and evaluate "[a]ll children with disabilities residing in the State . . . who are in need of special education and related services[.]" *Id.* § 1412(a)(3)(A); 34 C.F.R. § 300.111(a)(1)(i). This obligation extends beyond students enrolled in public schools, reaching any student residing in the state and all "[c]hildren who are *suspected* of being a child with a disability under § 300.8 and in need of special education, even though they are advancing from grade to grade[.]" 34 C.F.R. § 300.111(c)(1) (emphasis added); *id.* § 300.111(a)(1)(i).

A parent, state educational agency, other state agency, or LEA may request an initial evaluation to determine if a student qualifies as a child with a disability. 20 U.S.C. § 1414(a)(1)(B). If requested, a state or local agency "shall conduct a full and individual initial evaluation . . . before the initial provision of special education and related services to a child with a disability[.]" *Id.* § 1414(a)(1)(A). If the child is determined to be a child with a disability

---

[3]A local education agency is "a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools[.]" 20 U.S.C. § 1401(19)(A).

under the IDEA, then the LEA must create an IEP, which must include "a specific statement of the child's current performance levels, the child's short-term and long-term goals, the educational and other services to be provided, and criteria for evaluating the child's progress." *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 763 (6th Cir. 2001); 20 U.S.C. § 1414(d).

The IDEA also includes a series of procedural safeguards for parents, including a prior written notice requirement. 20 U.S.C. § 1415(b)(3). Under this requirement, the LEA must provide written notice to a child's parents if the LEA "refuses to initiate or change[] the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child." *Id.* § 1415(b)(3).

Under the IDEA, any party may file a due process complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child[.]" *Id.* § 1415(b)(6)(A). Parties are entitled to an impartial administrative due process hearing on the complaint. *Id.* § 1415(f). If aggrieved by the findings and decisions of the administrative hearing, a party may file civil suit in district court. *Id.* § 1415(i)(2)(A).

## B. Administrative Exhaustion

Claims alleging a violation of the IDEA must be administratively exhausted. *See Perez v. Sturgis Pub. Schs.*, 3 F.4th 236, 239–40 (6th Cir. 2021); 20 U.S.C. § 1415(i)(2). In their briefs, the parties disagree about whether certain claims were appropriately exhausted, namely whether Ja. B. and M. B. "made a formal request for a special education evaluation or that Appellee otherwise failed to comply with written notice requirements." (Appellee Br. 21.) At oral argument, Ja. B.'s attorney conceded that a parental request and related prior written notice claim were not before the court as independent, stand-alone claims. Given that IDEA claims must be appropriately exhausted, and these issues were not, we do not address them further. *See Perez*, 3 F.4th at 239–40.

**C.  The Child-Find Mandate**

When reviewing alleged violations of the IDEA, we review the district court's legal conclusions de novo and its findings of fact for clear error.  *Bd. of Educ. of Fayette Cnty. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007).  And district courts review IDEA cases under a modified de novo standard in which they set aside administrative findings only if the evidence presented "is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *Id.* at 312–13 (internal quotation marks and citation omitted).  "[M]ixed questions of law and fact, including the question of whether a child was denied a FAPE, are reviewed de novo, although the panel should accord due deference to the state administrative hearing officer's decision."  *Id.* at 313 (internal quotation marks and citation omitted).  In particular, deference is due to determinations involving educational expertise.  *Burilovich v. Bd. of Educ. of Lincoln Consol. Schs.*, 208 F.3d 560, 567 (6th Cir. 2000).

With respect to an alleged violation of the child-find mandate, "the claimant must show that school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate."  *L.M.*, 478 F.3d at 313 (internal quotation marks and citation omitted).  The Third Circuit has recognized that "Child Find does not demand that schools conduct a formal evaluation of every struggling student."  *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 249 (3d Cir. 2012).  Indeed, "[a] school's failure to diagnose a disability at the earliest possible moment is not *per se* actionable, in part because some disabilities 'are notoriously difficult to diagnose and even experts disagree about whether [some] should be considered a disability at all.'"  *Id.* (emphasis and alteration in original) (quoting *A.P. ex rel. Powers v. Woodstock Bd. of Educ.*, 572 F. Supp. 2d 221, 226 (D. Conn. 2008)).  Ultimately, "determining whether a child find violation occurred is a fact-intensive inquiry[.]"  *Spring Branch Indep. Sch. Dist. v. O.W. ex rel. Hannah W.*, 961 F.3d 781, 794 (5th Cir. 2020).

Plaintiffs allege that MJMS violated its child-find obligation by failing to identify and evaluate Ja. B. while he was enrolled in MJMS.  Specifically, Plaintiffs cite Ja. B. and M. B.'s frequent communication explaining Ja. B.'s history and home behavior and seeking interventions

and assistance from school; Ja. B.'s behaviors at school that resulted in repeated in-school and out-of-school suspensions; his admission to Vanderbilt University Medical Center for his mental health; and his arrest following a series of behavioral escalations at school.

While Ja. B. was enrolled at MJMS, the school did take some action to support Ja. B. First, Ja. B. and M. B. met with Ja. B.'s teaching team to discuss possible supports for Ja. B., including use of an agenda, reminders of the school's discipline system, and tutoring resources. Ja. B.'s teachers also communicated with Ja. B. and M. B. regarding Ja. B.'s behavior. Several school personnel, including Ja. B.'s teacher Ava Cozart and assistant principal Jeremy Willis, testified that Ja. B.'s behaviors in fall 2017, while enough to warrant disciplinary referrals, were not yet to the point of requiring a special education referral.

Then, when Ja. B. returned to school following his hospitalization, the school began the section 504 process. This process involved a two-week data collection period to determine which interventions would be best. Once the plan was created, the process required additional observation and data collection to determine the efficacy of the interventions and whether modification of the interventions or eventual referral under the IDEA was necessary.[4] Principal Leigh Anne Rainey and District Section 504 Coordinator Tammy Crane explained that WCS used a tiered "response-to-intervention" approach so that students are not over-identified or improperly referred for special education services. Dr. Stair, WCS's expert in eligibility determinations, also noted that it was appropriate for the school to give a student like Ja. B., who had not previously received special education services and who had recently experienced a major life event, time to adjust to his new environment. Even Ja. B.'s parents attributed some of his concerning behavior to the move.

It is true that a response-to-intervention framework "cannot be used to delay or deny the provision of a full and individual evaluation, pursuant to 34 C.F.R §§ 300.304–300.311, to a child suspected of having a disability under 34 C.F.R. § 300.8." U.S. Dep't of Educ., Off. of

---

[4]Plaintiffs argue that the record lacks evidence to support the district's claim that it collected data concerning Ja. B. and his behavior while at MJMS. But there was testimony that less formal, anecdotal data can be used to determine an appropriate intervention plan. So, while collecting written data may be a best practice, the absence of written data does not mean that WCS did nothing, particularly when, as here, MJMS held a section 504 meeting and created a section 504 plan.

Special Educ. & Rehab. Servs., OSEP 11-07, A Response to Intervention (RTI) Process Cannot Be Used to Delay-Deny an Evaluation of Eligibility under the Individuals with Disabilities Education Act (IDEA) (2011) at 2–3. But when the section 504 process began, WCS teachers did not suspect that Ja. B.'s behaviors were a result of a disability that required special education services. If "the LEA does not suspect that the child has a disability," it is permitted to deny a request for an evaluation.[5] *Id.* at 3. Additionally, we previously have acknowledged that a school did not violate its child-find responsibilities by first attempting other interventions for a student instead of immediately referring for an evaluation. *See L.M.*, 478 F.3d at 313–14; *see also D.K.*, 696 F.3d at 249, 252.

Additionally, Ja. B. only attended MJMS between August and November 2017. In cases that have found child-find violations, the observed behaviors that indicated a possible disability occurred over a longer time-frame—usually multiple years. For example, in *L.M.*, we determined that while the district ultimately violated its child-find responsibilities by failing to evaluate L.M. and provide him with an IEP for his third and fourth grade years, the school did not violate these responsibilities by using alternate intervention strategies in lieu of conducting an evaluation during his first and second grade years. 478 F.3d at 313–14. Similarly, the D.C. district court determined that the school district violated its child-find responsibilities by failing to evaluate a student when (1) that student had been enrolled in the district for ten years, (2) the school was aware of the student's hospitalization for her mental health in both her ninth and tenth grade years, (3) the school knew of a dramatic change in the student's academic performance, and (4) the district knew of the student's formal diagnoses of ADHD and depression. *N.G. v. District of Columbia*, 556 F. Supp. 2d 11, 18, 24, 26–27 (D.D.C. 2008).

In sum, Ja. B. had no history of receiving special education services, attended WCS for a very brief time, and had recently moved across state lines—a move that his parents acknowledged likely contributed to his behavior. And it is contested whether the school was aware of Ja. B.'s formal diagnoses. Expert witnesses testified that based on their review of the

---

[5]If an LEA denies a parental request for evaluation, it must issue a prior written notice. 20 U.S.C. § 1415(b)(3)(B). As discussed in Part II.B, any alleged violation of the prior written notice requirement was not appropriately exhausted, so we do not express an opinion as to whether a prior written notice was required here.

records, they did not believe a special education referral was necessary yet. WCS moved forward with the section 504 process following Ja. B.'s discharge from Vanderbilt and did not foreclose the possibility of a special education referral should the section 504 plan prove unsuccessful. It is true that WCS was neither as communicative, nor responsive, nor proactive as it could have been to meet Ja. B.'s needs and to respond to his parents' concerns. Still, on this record, we cannot say that WCS officials "overlooked clear signs of disability and were negligent in failing to order testing, or [had] no rational justification for not deciding to evaluate." *L.M.*, 478 F.3d at 313. To be sure, this is not a license for school districts to delay identification or evaluation of students, or otherwise drag their feet with respect to their IDEA obligations when presented with clear signs that a student—even one who is enrolled for only a short time—may have a disability. Rather, we conclude only that on these facts, especially given Ja. B.'s general education background and recent move, the school district did not violate its statutory child-find responsibility.

Plaintiffs also failed to demonstrate that WCS violated its child-find obligation after Ja. B. withdrew from WCS. *See id.*; 34 C.F.R. § 300.111(a)(1)(i). While homeschooling Ja. B., Ja. B. and M. B. met with MJMS and district officials in November 2017, February 2018, and June 2018. In November, the group finalized the section 504 plan. In June 2018, Ja. B. and M. B. met with Tammy Crane, a meeting that Ja. B.'s testimony indicates was meant to make another district official aware of the experience Ja. B. and his family had with WCS, rather than to provide additional information that may have indicated an evaluation was necessary.

This leaves the February 2018 meeting between Ja. B. and Rainey. Though Ja. B. testified that he presented Rainey with Dr. Klaver's report and diagnoses, and that Rainey told him that Ja. B. would have qualified for an IEP based on this information, Rainey did not recall this particular exchange. During the hearing, the full report was not entered into evidence, nor did the parties call the doctor who performed the evaluation to testify. Thus, the ALJ determined that the record did not provide enough evidence to establish that Ja. B. would have qualified for special education services or that WCS should have initiated the referral process based on this information. Additionally, testimony presented during the hearing indicated that not every mental health diagnosis would qualify a student for special education and related services,

particularly if the diagnosis does not have an educational impact.  Thus, on this record, it cannot be said that WCS failed to meet its statutory duty when it did not evaluate Ja. B. after his disenrollment.  *See L.M.*, 478 F.3d at 313.

Because the district did not violate the IDEA's child-find mandate, the district did not deny Ja. B. a FAPE, and so we need not address the appropriateness of Ja. B.'s placements at Cates and Meridell.

## III.  CONCLUSION

For the foregoing reasons, we affirm the district court's decision.