NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0084n.06

Case No. 24-5969

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Feb 11, 2026
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| G. E., the minor student, by and through S.B., the student's parent and legal guardian, | ) ) ) | |
|     Plaintiff-Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE |
|     v. | ) ) | |
| WILLIAMSON COUNTY BOARD OF EDUCATION, | ) ) ) | |
|     Defendant-Appellee. | ) ) | O P I N I O N |

Before: BOGGS, LARSEN, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. G.E., a student who attended public school in Williamson County, Tennessee, and his parent, S.B., sued the Williamson County Board of Education for violations of the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act, and Title II of the Americans with Disabilities Act. They allege that the Board failed to identify and evaluate G.E. in fifth, sixth, or seventh grade for disability accommodations under federal law. The district court determined that the school district did not violate its responsibilities under any statute. For the reasons outlined below, we affirm the judgment of the district court.

## I.

*A. Factual Background*

This case follows G.E.'s struggles with anxiety and depression as he navigated fifth, sixth, and seventh grade in the Williamson County school district, and his mother's attempts to get him services under Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*

1. *Fifth Grade (2017–2018)*

G.E.'s educational journey started at Crockett Elementary School, where he enrolled for fifth grade during the 2017–2018 school year. At the start of the school year, S.B. filled out a health form indicating that G.E. suffered from anxiety. Yet the record reflects few instances of G.E.'s anxiety manifesting itself at school. Teachers at Crockett were instead most concerned with G.E.'s recurrent absences: forty-one absences and seventeen tardies during his fifth-grade year. About half the absences, and only two of the tardies, were excused by either S.B. or a doctor's note—most often because G.E. suffered from the flu or some other physical illness. And while the record does not speak to G.E.'s twenty-one unexcused absences, he argued below that at least some of those absences related to his mental-health struggles.

Teachers at Crockett expressed repeated concerns about G.E.'s absences. For example, in November 2017, G.E. and S.B. spoke with three of G.E's teachers in a meeting focused on G.E.'s attendance and the impact his frequent absences were having on his educational performance. At that meeting, S.B. informed the teachers of G.E.'s anxiety. But, according to S.B., they responded by advising her that she just "needed to get [G.E.] to school." (Administrative Record ("AR"), 15-10, PageID 3991). That same month, an initial evaluation of G.E. at Vanderbilt Behavioral Health

led to a three-part diagnosis: G.E. had generalized anxiety disorder, panic attacks, and depression. Following this evaluation, mental-health professionals at Vanderbilt Behavioral Health recommended that G.E. attend therapy and prescribed him anxiety medication. Despite the recommendations and appointments scheduled throughout the school year, G.E. never attended therapy.

Though G.E.'s anxiety rarely surfaced at school, education professionals at Crockett became more aware of it in March 2018. Early that month, a student "ma[de] fun of [G.E.]" for drawings he made, upsetting G.E. and prompting him to punch a wall. (AR 15-12, PageID 4978). G.E. spoke to the school's counselor following the episode. Then, later that evening, S.B. informed the same counselor that G.E. had started psychiatric care to help him overcome his anxiety and depression. The counselor thanked S.B. for providing her with this new information and relayed his teachers' concerns about G.E.'s chronic absences. However, the counselor could not remember if she had shared with G.E.'s teachers the information S.B. had given her about G.E.'s mental-health issues.

The day after the punching incident, G.E. and S.B. met with Crockett's principal, Bronwyn Rector. According to S.B., she sought the meeting because another student was bullying G.E. on the bus. Rector's notes on the meeting indicate that G.E. did not want to attend school, that he was struggling with anxiety, depression, and his self-image, and that he was receiving treatment at Vanderbilt and adjusting to new medication.

Amid growing concerns about G.E.'s absences and S.B.'s lack of communication, Randolph submitted a social-work request for G.E. on March 22, 2018. By the end of March, doctors had doubled G.E.'s anxiety-medication dosage. In early April 2018, S.B. advised one of G.E.'s teachers of the increased dosage and asked her to "understand" if G.E. was tired or

emotional that day. (AR 15-17, PageID 6869). The teacher responded and ensured S.B. that she would "keep an extra eye on" G.E. (*Id.*). This exchange proved prescient, as later that day, G.E. tripped in the hallway, hit his head, and lost consciousness. S.B. reported to the school nurse that G.E. had been experiencing side effects from his increased anxiety-medication dose.

Despite all this, G.E. finished fifth grade with passing grades.

### 2. *Sixth Grade (2018–2019)*

G.E. continued his education at Woodland Middle School for sixth grade.[1] As in the year before, S.B. submitted a health form to the school detailing G.E.'s health history. This time, she listed anxiety and depression as G.E.'s medical conditions and informed the school of his anxiety-medication prescription.[2] Much like his time at Crockett, G.E.'s frequent absences—eighteen absences and thirty-six tardies by the end of the 2018–2019 school year—greatly concerned his teachers. And while at least one teacher was aware that G.E. had "some anxiety," the record reflects that physical illnesses like strep throat, mono, and headaches were the main reasons for G.E.'s absences. (AR 15-7, PageID 2867).

By October 2018, several of G.E.'s teachers tried to meet with S.B. to discuss G.E.'s absences and their impact on his learning. Though the teachers were unsuccessful in their attempts to schedule a meeting with S.B., some of G.E.'s teachers continued offering to help G.E. catch up on missing assignments and reiterated their concerns about his absences. And when S.B. reached out, teachers were happy to help, offering guidance on how he could catch up to pass his classes

---

[1] Though G.E. was not zoned to attend Woodland, a clerical error allowed him to attend the school without a waiver.

[2] In August 2018, S.B. took G.E. to Lifecare for an evaluation, and doctors there again diagnosed G.E. with various mental-health issues and recommended that G.E. attend therapy (he attended one session). S.B. and G.E. indicated to Lifecare that G.E. had attendance issues that were "due to [mental illness] symptoms." (AR 15-14, PageID 5748). And they denied that G.E. had any "In-School Behavior Problems." (*Id.*). S.B. did not provide either Crockett or Woodland with medical records from these evaluations.

and even offering to tutor him. In spite of his struggles, G.E. finished sixth grade with Bs in science and social studies and Cs in math and English language arts.

Toward the end of the 2018–2019 school year, S.B. informed the school that they were moving to a new home—still in Williamson County. School personnel advised S.B. that the new home was not zoned for attending Woodland. So S.B. sought an exemption to allow G.E. to continue his education there. Following an initial denial in June 2019, the Williamson County Board of Education ("WCBOE" or "Board") eventually approved S.B.'s request for G.E. to attend Woodland after she assured the Board that she intended to lease an in-zone home.

In July 2019—the summer before G.E.'s seventh-grade year—G.E., through S.B., filed a due-process complaint with the Tennessee Department of Education alleging that WCBOE had violated Section 504 and the IDEA. Later that month, WCBOE initiated an IDEA and Section 504 evaluation at S.B.'s request. In early August 2019, WCBOE sought S.B.'s consent to evaluate G.E. for IDEA and Section 504 eligibility. S.B. consented to an initial evaluation but later denied WCBOE consent to perform a psychological evaluation.

3. *Seventh Grade (2019–2020)*

G.E. continued his schooling at Woodland for seventh grade. WCBOE continued the IDEA and Section 504 evaluation first initiated after G.E.'s sixth-grade year by organizing in July and August 2019 an Individualized Education Plan ("IEP") team that met on September 18, 2019. After a three-and-a-half hour meeting, the team concluded that although G.E. suffered from anxiety, he did not qualify as having one of the listed disabilities in the IDEA. It also concluded that while G.E. "displayed characteristics of anxiety in the home and school setting," the "data did not support that [his] anxiety adversely impacted his educational performance," nor did his condition "require[] specially designed instruction" for him to "meet grade level expectations and

advance from grade to grade." (AR 15-17, PageID 6946). And the team found that although G.E.'s "excessive absenteeism" had an adverse impact on his educational performance, there was no support for S.B.'s "proposition that [G.E.'s] absences were primarily caused by his anxiety." (*Id.*). WCBOE agreed to schedule another IDEA-eligibility meeting once it received evaluations from G.E.'s private neuropsychologist and the district's evaluator. Although the IEP team also intended to evaluate G.E. for Section 504 eligibility at the September 2019 meeting, S.B. asked to reschedule. The team offered S.B. several times to reschedule, but S.B. never agreed to a new date and time.

In the meantime, G.E.'s mental-health struggles escalated. From October 2019 to February 2020, G.E. participated in a partial hospitalization program with Rogers Behavioral Health to receive treatment for his anxiety, depression, obsessive-compulsive disorder, and sensory issues. Because G.E.'s treatment through the Rogers program spanned most of the school day, WCBOE provided G.E. with homebound instruction, which he received up until the COVID-19 pandemic caused school shutdowns in early March 2020. After G.E.'s time in the Rogers program ended, WCBOE offered to evaluate G.E. for Section 504 accommodations, but S.B. declined.

### 4. *Eighth Grade (2020–2021)*

Recall that S.B. had consented to an IEP evaluation in July and August 2019, but denied WCBOE consent to perform a psychological evaluation. A year later, in August 2020, an administrative law judge ("ALJ") ordered S.B. to allow WCBOE's physician, Dr. Vance Sherwood, to conduct a psychological evaluation of G.E. After receiving the results of that evaluation, WCBOE proposed holding another IDEA-eligibility meeting and Section 504 meeting, but G.E. and S.B. refused to participate. By that point, S.B. had moved G.E. to Currey Ingram Academy, a private school that provided instruction tailored to students who suffer from anxiety.

The move to Currey Ingram was temporary, however, and G.E. planned to return to Woodland for the 2020–2021 school year, when able.

### B. *Procedural History*

As discussed, S.B. filed a due process complaint on G.E.'s behalf in July 2019. The complaint initially alleged that throughout G.E.'s fifth-through-eighth-grade years, WCBOE had violated its obligations under the IDEA and Section 504 to identify, locate, and evaluate children with disabilities, otherwise known as the "child-find" mandate. *See* 20 U.S.C. § 1412(a)(3) (IDEA child-find obligation); 34 C.F.R. §§ 104.32, 104.35 (implementing regulations for Section 504 child-find obligation). G.E. eventually amended the complaint to add allegations that WCBOE had also violated the ADA. He argued under each claim that his absences triggered WCBOE's child-find obligations and that WCBOE violated those statutes by failing to evaluate him sooner. In July 2021, an ALJ denied G.E.'s claims after a twelve-day due-process hearing.

G.E. appealed the ALJ's decision to the district court. G.E. moved for judgment on the administrative record, arguing that WCBOE violated Section 504's child-find mandate for his fifth- and sixth-grade years and violated the IDEA by finding G.E. ineligible for special-education services during his seventh-grade year. A magistrate judge issued a report and recommendation ("R&R") to affirm the ALJ's decision and deny G.E.'s motion. After considering G.E.'s objections to the R&R, the district court found that the ALJ had not conducted an adequate independent assessment of the facts and remanded the case for the ALJ to reconsider.

The ALJ revised her order but, once again, denied G.E.'s claims. G.E. appealed, this time amending his complaint to add an allegation that WCBOE failed to reasonably accommodate him during his fifth- and sixth-grade years in violation of the ADA and Section 504. Once more, G.E. moved for judgment on the administrative record. Though the magistrate judge recommended

denying his motion, she suggested revising some of the ALJ's findings of fact based on the record. The district court adopted the R&R. G.E. appealed, challenging only the district court's decision on his fifth- and sixth-grade Section 504 claim and his seventh-grade IDEA claim.

## II.

In reviewing a state ALJ's decision under Section 504 or the IDEA, the district court "applies a modified de novo standard of review." *L.H. v. Hamilton Cnty. Dep't of Educ.*, 900 F.3d 779, 790 (6th Cir. 2018) (citation modified). That standard requires the district court to "make an independent decision based on the preponderance of the evidence" while also granting the state ALJ's decision "'due weight.'" *Id.* (citation omitted). And we review the district court's findings of fact for clear error and its legal conclusions de novo. *Knox County v. M.Q.*, 62 F.4th 978, 990 (6th Cir. 2023).

## III.

We start with G.E.'s Section 504 child-find claim regarding his fifth- and sixth-grade years. G.E. contends that he is entitled to relief under that statute because WCBOE violated its child-find obligation.

### A. Child-Find Mandate for Section 504 of the Rehabilitation Act

Section 504 makes it unlawful for an "otherwise qualified individual with a disability" to, "solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Public schools receiving federal financial assistance are included within this prohibition. *M.Q.*, 62 F.4th at 999. Most relevant here, Section 504 contains a child-find mandate. *See M.G. ex rel. C.G. v. Williamson Cnty. Schs.*, 720 F. App'x 280, 284 n.4 (6th Cir. 2018). In particular, Section 504's implementing regulations require public schools to

"[u]ndertake to identify and locate every qualified handicapped person" within the school district who is "not receiving a public education" and to ensure that they and their parents receive notice of the school's "duty" under Section 504. 34 C.F.R. § 104.32. The public school receiving federal funds must "conduct an evaluation . . . of any person who, because of handicap, needs or is believed to need special education or related services" before providing such services. *Id.* § 104.35(a). And if the evaluation results indicate that a student should receive accommodations, the school must create a Section 504 plan for that student to meet his or her needs. *Id.* § 104.33(b). The child-find requirement is a procedural obligation under Section 504. *See P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009); *see also Bd. of Educ. of Fayette Cnty. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007) (finding the same under the IDEA).

### B. Fifth and Sixth Grade—Section 504

But Section 504 also imposes substantive obligations on school districts, including prohibiting discrimination on the basis of disability. *M.Q.*, 62 F.4th at 999–1000; *P.P.*, 585 F.3d at 735. To impose liability for discrimination under Section 504, a plaintiff "must establish" that he (1) is a handicapped person under Section 504; (2) is otherwise qualified to participate in the relevant program; (3) is being excluded from participation in, denied the benefits of, or subjected to discrimination under the program "solely by reason of his handicap"; and (4) the program receives federal funding. *M.Q.*, 62 F.4th at 1000 (citation omitted).

This legal standard proves problematic for G.E. because he does not frame his claim within these four elements. Instead, G.E. claims that WCBOE's alleged failure to meet its Section 504 child-find obligation during G.E.'s fifth- and sixth-grade years is sufficient to recover under Section 504. *P.P.*, 585 F.3d at 735. But we have previously established that plaintiffs seeking relief must do more than simply show that the school violated a procedural duty under Section

504, such as the child-find mandate. *See G.C. v. Owensboro Pub. Schs.*, 711 F.3d 623, 635 (6th Cir. 2013); *M.Q.*, 62 F.4th at 1001. Rather, they must satisfy the four elements of a Section 504 discrimination claim. *G.C.*, 711 F.3d at 635 ("[M]erely asserting that the defendants failed to meet certain obligations under § 504 of the Rehabilitation Act and various regulations is insufficient to succeed on a Rehabilitation Act claim."). Thus, G.E. must show that WCBOE discriminated against him because of his disability, not merely that it did not "find" him. *M.Q.*, 62 F.4th at 1001.

Our precedent offers two pathways for G.E. to satisfy this burden: G.E. may prove that WCBOE intentionally discriminated against him, or he can show that it failed to accommodate his disability.[3] *See Wilson v. Gregory*, 3 F.4th 844, 859–60 (6th Cir. 2021). G.E. takes neither path, instead asserting that WCBOE's child-find violation is enough to trigger Section 504's anti-discrimination protections. But we rejected a similar approach in *Knox County v. M.Q.* There, M.Q. argued that the school's failure to abide by its Section 504 obligation to place him in the least restrictive environment is "a distinctly cognizable form of discrimination under Section 504 . . . that exists in addition to traditional intentional discrimination and failure-to-accommodate theories of liability." *M.Q.*, 62 F.4th at 1001. We found that M.Q.'s "novel argument c[ould not] withstand scrutiny" because he bears the "burden to satisfy each element in the multi-prong standard for such actions." *Id.* Like M.Q., G.E. provides us with "no legal basis" to "depart from this well-established legal framework." *Id.* So, as in *M.Q.*, we decline to do so.

---

[3] WCBOE argues that this requirement called for G.E. to show bad faith or gross misjudgment, a view that we approvingly referenced in *G.C.*, 711 F.3d at 635. But we later called into question the propriety of such a requirement in *M.Q.*, 62 F.4th at 1002. And after oral argument in this case, the Supreme Court rejected the bad-faith or gross-misjudgment standard in *A.J.T. v. Osseo Area Schools*, 605 U.S. 335, 345 (2025). Still, we need not address the issue here because G.E.'s "claim[] fail[s] at an earlier point; he fails to show he suffered any form of discrimination." *M.Q.*, 62 F.4th at 1002.

### C. Failure to Accommodate

Even if we read G.E.'s argument to raise a failure-to-accommodate claim, it still fails. To establish a failure to accommodate, a plaintiff "must show that the defendant reasonably could have accommodated his disability but refused to do so" and that the failure to accommodate "impeded his ability to participate in, or benefit from, the subject program." *M.Q.*, 62 F.4th at 1000 (citation modified). G.E. mentions that WCBOE should have provided him with an "exposure plan" to help him overcome his school phobia. He posits that exposure therapy[4] would have helped close his skill gap and satisfy the social worker's recommendation for counseling. He also points out that such therapy is a recognized technique for helping students overcome school phobia.

Perhaps exposure therapy could have helped G.E. Standing alone, however, that fact does not mean that WCBOE knew G.E. needed some form of intervention. A publicly funded school must have knowledge of an individual's disability for it to be compelled to provide an accommodation. *See Carten v. Kent State Univ.*, 78 F. App'x 499, 500–01 (6th Cir. 2003) (explaining that a public university "is not required to provide [an] accommodation to a student under the ADA or Rehabilitation Act until the student provides a proper diagnosis of his claimed disability and specifically requests an accommodation") (citing *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 437 (6th Cir. 1998)). True, Vanderbilt and Lifecare recommended that G.E. attend therapy to help with his anxiety, which, if known to WCBOE, may have provided

---

[4] Exposure therapy in this context is a process by which a person is slowly introduced to a fearful situation through a series of steps to help them overcome that fear. With respect to overcoming the fear of getting to school, that can include "driv[ing] them to the parking lot" and "teach[ing] them how to relax and calm their anxieties in the parking lot." (AR 15-7, PageID 2740). From there, "you would walk them to the front door," "walk them back, calm them, walk them through the front door, [and] have them initially meet with a teacher to get back." (*Id.* at PageID 2741). And it can include developing accommodations to help the individual stay in school, including giving them a space to go, or a person to talk to, to help calm them down.

notice that G.E. required some sort of accommodation at school. But G.E. points to no evidence in the record indicating that he made WCBOE aware of the recommendations. Similarly, the record does not reflect that S.B. attempted to request any form of in-school therapy to help G.E. improve his attendance. Instead, it shows that S.B. explained to some of G.E.'s teachers that G.E. was "having some anxiety, . . . feeling overwhelmed[,] and . . . just having a hard time," and that the teachers responded by urging S.B. to "get him to school." (AR 15-10, PageID 3990–91). On this record, S.B. did not ask for further assistance in getting G.E. to school. And G.E. does not explain how WCBOE should have divined the need for formal accommodations. After all, WCBOE knew that half of G.E.'s fifth-grade absences stemmed from some physical illness. Moreover, while G.E. says his anxiety caused some of these absences, he points to no record evidence tending to show that WCBOE knew or had reason to suspect that was the case. As such, G.E.'s Section 504 claim lacks a viable theory and therefore fails.

### D. Overlap between Section 504 and the IDEA

Resisting this outcome, G.E. spends a good deal of his briefing faulting the district court's adoption of the R&R's analysis, which did not consider his Section 504 claim independent of his fifth-grade-and-sixth-grade IDEA claims. True, the district court explained that "a determination of whether G.E. had a disability and need for services under [the IDEA] is dispositive of that determination for [Section 504]" because "G.E. and S.B. largely address the child-find claims under both statutes as if they are one in the same." (Mem. Op., R. 62, PageID 8128). But given our de novo review of the legal basis for G.E.'s claims, we need not resolve this issue.

That said, we acknowledge that "section 504 protects a larger group of individuals" than does the IDEA. *Ja. B. v. Wilson Cnty. Bd. of Educ.*, 61 F.4th 494, 496 n.1 (6th Cir. 2023). Section 504, unlike the IDEA, is not limited to the specific disabilities listed in the statute. *See* 34 C.F.R.

§ 104.3(j). So, in theory, under Section 504 school officials would need to be on the lookout for more behavioral cues in order to meet their child-find obligation than they would to meet their child-find obligation under the IDEA. But here, G.E. relied on the same facts and arguments, and requested the same relief for his claims under Section 504 as he did for his claims under the IDEA. Courts confronting such circumstances have determined that lower courts may analyze these claims together. *See N.L. ex rel. Mrs. C. v. Knox Cnty. Schs.*, 315 F.3d 688, 695–96 (6th Cir. 2003) ("In sum, precedent has firmly established that section 504 claims are dismissed when IDEA claims brought on the theory of a denial of free appropriate public education are also dismissed."); *Urban ex rel. Urban v. Jefferson Cnty. Sch. Dist. R-1*, 89 F.3d 720, 728 (10th Cir. 1996) (relying on the similarities between the child-find and special-education obligations of Section 504 and the IDEA to dispose of a student's Section 504 claim requesting a specific placement, because the student was not entitled to the placement requested under the IDEA); *J.M. ex rel. C.M. v. Summit City Bd. of Educ.*, 39 F.4th 126, 147 (3d Cir. 2022) (finding no error in collectively considering the plaintiffs' Section 504 failure-to-accommodate claim and IDEA child-find claim because the plaintiffs did not present unique evidence for the Section 504 claim). And, in any event, whether G.E.'s observations about the interlocking nature of these statutes are correct, he cannot overcome his failure to brief the four elements of his Section 504 claim. His efforts to do so in his reply brief also fall short. *See Grand v. City of Univ. Heights*, 159 F.4th 507, 516 (6th Cir. 2025) ("[A]rguments made for the first time in a reply brief are forfeited."). For G.E.'s argument, the beginning is the end: WCBOE's failure to evaluate him for a 504 Plan by itself proves discrimination. But, as discussed in Section III(B), our caselaw does not support this essentially strict-liability approach. And G.E. directs us to no case finding liability under such circumstances. His claim therefore fails.

**IV.**

G.E. also argues that WCBOE violated its IDEA child-find mandate during his seventh-grade year by failing to timely reevaluate him for an IEP after learning of his partial hospitalization treatment and providing him with homebound instruction from October 2019 through February 2020. We disagree.

*A. IDEA Child-Find Mandate*

IDEA's child-find mandate requires school districts receiving federal funding for special education services and resources to "identif[y], locate[], and evaluate[] . . . children with disabilities" who need "special education and related services." 20 U.S.C. § 1412(a)(3)(A). This obligation requires schools to do two things: (1) evaluate any identified student at the request of the state, a parent, or the school district, and (2) create an IEP addressing the child's needs, should the evaluation reveal that the child has a disability under the IDEA. *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 762–63 (6th Cir. 2001). However, "[c]hild [f]ind does not demand that schools conduct a formal evaluation of every struggling student." *Ja. B.*, 61 F.4th at 502 (quoting *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 249 (3d Cir. 2012)). Even where a school may suspect a disability, we "previously have acknowledged that a school did not violate its child-find responsibilities by first attempting other interventions for a student instead of immediately referring for an evaluation." *Id.*

The IDEA provides relief for a school's failure to adhere to a procedural requirement, such as its child-find mandate, where that failure "cause[s] substantive harm to the student." *L.M.*, 478 F.3d at 313. To establish a procedural violation, a plaintiff "must show that school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was

no rational justification for not deciding to evaluate." *Id.* (citation omitted). Whether a district violated its child-find mandate is a fact-intensive inquiry. *Ja. B.*, 61 F.4th at 502.

*B. Seventh Grade Child-Find Violation—IDEA*

G.E. does not challenge WCBOE's adherence to its child-find mandate at the beginning of G.E.'s seventh-grade year. And that makes sense because WCBOE convened an IEP team in September 2019 to evaluate G.E. for IDEA special education and a Section 504 plan. G.E. instead challenges WCBOE's post-evaluation conduct. Specifically, he contends that WCBOE violated its continuing child-find obligation through at least March 2020, when WCBOE stopped providing G.E. with homebound instruction.

The record does not show that WCBOE violated its child-find mandate under the IDEA. Consider the events that transpired during this time. The September 2019 IEP team found that although G.E. suffered from anxiety, he did not "meet the state eligibility requirements for a disability under the IDEA." (AR 15-17, PageID 6946). In October 2019, G.E. enrolled in the Rogers Behavioral Health Partial Hospitalization Program. That month, WCBOE learned of G.E.'s diagnoses: ADHD, generalized anxiety disorder, obsessive-compulsive disorder, and unspecified depressive disorder. It thereafter provided G.E. with homebound instruction. A few months later, in January 2020, Rogers Behavioral Health discharged G.E., at which point G.E. started outpatient treatment. Then, in February 2020, G.E. requested continuing homebound instruction with the possibility of transitioning back to Woodland. WCBOE provided G.E. with homebound instruction until it shut down all of its schools due to the COVID-19 pandemic in March 2020.

But through all that, WCBOE never had enough information to trigger reevaluation under the IDEA. All agree that G.E.'s mental-health issues worsened during seventh grade. But G.E.

has not directed us to any new evidence obtained by WCBOE after the September meeting that would have required it to reevaluate him for an IEP. Plus, WCBOE chose to take a different tack before reevaluation: homebound education. And G.E. cannot fault WCBOE's choice to try another remedial option first. *See Ja. B.*, 61 F.4th at 503 (making a similar point).

It is also noteworthy that the IEP team had just conducted an evaluation two months before beginning G.E.'s homebound instruction. We previously endorsed a school's choice to use "alternative intervention strategies" after conducting a complete evaluation of a student, even though it did not order a second IDEA evaluation until nearly three years later. *M.G.*, 720 F. App'x at 285. This aligns with the Third Circuit's approach, which gives school districts "a reasonable time" after the initial evaluation and finding of no disability "to monitor the student's progress before exploring whether further evaluation is required." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 273 (3d Cir. 2012); *see also M.G.*, 720 F. App'x at 285 (citing *Ridley* approvingly). We find that approach persuasive. Yes, WCBOE had sufficient notice of G.E.'s anxiety to conduct an IEP evaluation. But WCBOE also was allowed a reasonable amount of time to monitor G.E.'s progress after finding that anxiety did not warrant special education under the IDEA and assess whether reevaluation was appropriate. And G.E. has not provided a compelling reason to suggest that WCBOE's failure to reevaluate was negligent or lacked a rational justification. Nor does he explain why two months—or even the five-month span between G.E. beginning homebound instruction and WCBOE shutting down all schools due to COVID-19—was not a reasonable length of time for WCBOE to assess G.E.'s performance and decide whether it needed to schedule another IEP meeting.

Further, WCBOE had a rational justification for failing to reevaluate at any later point in seventh grade. Throughout the 2019–2020 school year, WCBOE—in an effort to reintegrate G.E.

at Woodland—tried to determine if G.E. had a disability. Unfortunately, by then, due-process proceedings were pending, and S.B. was less receptive to some of WCBOE's overtures. For instance, S.B. rejected WCBOE's request for a clinical psychological evaluation as early as July 2019, when it requested the initial IEP evaluation. Still, WCBOE eventually obtained an order from the ALJ in August 2020 that allowed it to conduct the evaluation. And, after S.B. asked to postpone the Section 504 meeting scheduled for after the September 2019 IEP evaluation, the parties were unable to agree to a new time for the meeting. Then, in early August 2020, when WCBOE raised the prospect of reevaluating G.E. before the start of his eighth-grade year, S.B. and G.E., concerned about issues with COVID-19, sought limitations on Dr. Sherwood's evaluation. Their reluctance necessitated the intervention of the ALJ to order G.E.'s participation. In the meantime, WCBOE offered to schedule a Section 504 meeting as a stopgap, at least until the evaluation issue was resolved. But that meeting never happened because S.B. placed G.E. in private school to "address certain deficit areas." (AR 15-5, PageID 1983). And although WCBOE offered to reevaluate G.E. for services after it had the results of Dr. Sherwood's evaluation, S.B. decided not to move forward with a reevaluation.

Under the IDEA, WCBOE needed S.B.'s consent and participation to further evaluate G.E. *See* 20 U.S.C. § 1414(a)(1)(D)(i)(I). Because S.B. declined to participate in the proposed evaluations, WCBOE cannot be faulted for failing to reevaluate G.E. after instituting homebound education. S.B.'s lack of cooperation was a rational justification for choosing not to reevaluate. *Ja. B.*, 61 F.4th at 504. Therefore, we conclude that WCBOE did not violate its child-find mandate at any time during G.E.'s seventh-grade year.

### V.

We AFFIRM.